61 F.2d 339 (1932)
THE PRINCESS SOPHIA.
In re CANADIAN PAC. RY. CO.
BRACE et al.
v.
CANADIAN PAC. RY. CO. et al.
No. 6390.
Circuit Court of Appeals, Ninth Circuit.
October 3, 1932.
*340 Wm. Martin, Chas. A. Wallace, and Grosscup & Morrow, all of Seattle, Wash., for appellants.
Lawrence Bogle, Cassius Gates, and Bogle, Bogle & Gates, all of Seattle, Wash., for appellees.
Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.
SAWTELLE, Circuit Judge.
This appeal brings before the court a decree of the United States District Court for the Western District of Washington, entered on February 13, 1930, awarding to the petitioner limited liability for claims presented for the wrongful death of passengers and crew on board the steamship Princess Sophia. The appeal further presents the question of the right of five classes of claimants to participate in the fund deposited in court by the petitioner and the right to an award for such further amount as the court may determine to be the compensation for losses sustained by the alleged acts of omission and commission of the petitioner.
A brief account of the wreck, the substance of the petition and appellants' answers thereto, as well as their affirmative defenses, are, we think, correctly set forth in the statement made by the lower court. That statement, which we adopt in substance, with a few minor textual changes, follows:
"On October 24, 1918, the Princess Sophia, owned by the Canadian Pacific Railway Company, stranded on Vanderbilt reef, *341 in Lynn Canal, Alaska, and during the night of October 25th the vessel foundered, resulting in the loss of the vessel and cargo and of the lives of all of the passengers and crew on board. Suits for damages were asserted. On the 28th day of February, 1919, the owner petitioned this court, seeking to obtain the benefit of sections 4283, 4284, and 4285, R. S. (sections 8021, 8022 and 8023, Comp. St. [46 USCA §§ 183-185]), limiting the liability for all loss resulting, and prayed that a trustee be appointed, to whom the interest in the steamship and her pending freight might be transferred and monition issued, warning all persons having claims by reason of the catastrophe to present the same within a fixed time, and that the owner be decreed not liable for loss, or, if liable, its liability be limited to the property surrendered. A trustee was named, and the interest of the company in the steamship and pending freight was transferred to him. A lifeboat afterwards discovered was reported to the court, and its value paid to the trustee.
"Answers have been filed by many claimants, contesting the petitioner's right to limit liability, and it is affirmatively charged that the petitioner operated the steamship as a common carrier for passengers and freight for hire between the ports of Skagway and Vancouver and Seattle, and extensively advertised throughout Canada and the United States its lines of steamers, particularly the Princess Sophia, as being well adapted to navigate the waters of the inside passage to Alaska; that the officers were specially qualified to sail in such waters, and were familiar with the dangers, reefs, and rocks; that the vessel was staunch and strong; that on the 23d of October the Princess Sophia was at Skagway, and that the passengers purchased tickets and went aboard and became passengers for hire, and that its officers failed to carry out such statements, etc.; that the route over which the petitioner operated its vessels was a dangerous route, and extremely difficult to navigate with safety in fog, rain, snowstorm, and thick weather, especially and particularly that portion known as Lynn Canal; that on account of such dangers there is placed a lighthouse at Eldred Rock, 30 miles south of Skagway to the starboard, and a light at Point Sherman, 38 miles south of Skagway, and a light at Sentinel Island, 60 miles south of Skagway; that a vessel navigating such route in clear weather at night could see the light at Point Sherman until the light at Sentinel Island was picked up; that Vanderbilt reef is about 18 miles south of Point Sherman and about 1¾ miles to the westward of the regular route traveled by vessels passing to the starboard; that it is dangerous to attempt the navigation of said passage at night, unless vessels can pick up Point Sherman light before passing Sentinel Island light, before reaching the vicinity of Vanderbilt reef; that vessels cannot undertake said route during heavy rains or snowstorms or thick weather with any degree of safety, and in doing so run great risk of being wrecked, all of which was well known to the officers and agents and employees of the petitioner; that the petitioner made it a practice to run and operate steamers for many years over said route at an unlawful rate of speed in thick weather, and at night when such lights could not be seen, in violation of law and rules of navigation; that such was the usual and customary method of navigating the steamship Sophia, and it was well known, permitted, authorized and directed by the petitioner and its officers, naming various persons; that the Princess Sophia left Skagway at 10:10 p. m. October 23d, at which time she had on board a large and excessive number of passengers, and more than she had accommodations for, and more than she was permitted by law to carry; that she proceeded in a reckless and careless manner, at an excessive rate of speed, and at about 12 o'clock p. m. ran into a blinding snowstorm, and continued to run in such snowstorm without being able to pick up Eldred Rock light, and without being able to pick up Sentinel Island light, and while so running at full speed struck and ran upon Vanderbilt reef at about 2 o'clock a. m. October 24th; that upon striking said reef she rose out of the water and ran the greater part of her length on said reef, with such force as to tear away plates on the bottom of said vessel, and tore a hole from the bow on the starboard side about 2 feet wide, to about 60 feet aft, throwing many passengers from their berths and causing great fear and anxiety among her passengers; that immediately upon striking said reef wireless messages were sent to managing officers of the petitioner at Juneau, Skagway, Ketchikan, Vancouver, Victoria, and Prince Rupert; that shortly thereafter the tide rose, causing the vessel to pound hard upon the rocks and causing great fear and distress among the passengers, which information was conveyed by wireless from the officers of said steamship to the officers and agents of the petitioner; that the lives of the passengers upon said steamship upon her stranding were immediately placed in great peril; that it was the duty of the petitioner, *342 its officers, agents, and employees, to take immediate steps to remove said passengers to places of safety, which could have readily and easily been done by lowering lifeboats of said steamship upon Vanderbilt reef at low tide, and launching the same to the leeward of said reef, and allowing the passengers to step down from the steamer upon said reef and into said lifeboats, which could have readily been done; that lifeboats could then have been rowed to vessels standing by, and her passengers transferred; that such lifeboats could have been rowed to boats within the vicinity of said rocks, where all the passengers could have been landed without difficulty, or that said passengers could have been saved by launching the two aft starboard lifeboats from said vessel into the water and transferring the passengers from lifeboats into other vessels standing near by, or by lowering lifeboats at high tide and transferring the passengers to the vessels standing by; that this could have been done at all times until noon of October 25th, and other methods of transferring passengers were set out; that, in order to save the expense of removing the passengers, petitioner decided to keep the passengers on board the Princess Sophia until it could send one of its vessels from Vancouver to Vanderbilt reef, a distance of 950 miles; that in accordance with such plan petitioner at 11 p. m. October 24th sent the steamship Alice, with directions to go to Vanderbilt reef and take the passengers from the Princess Sophia and carry them to their destination; that it would take about 65 hours for the Princess Alice to reach Vanderbilt reef; that the vessels, Peterson, Estebeth, Amy, King & Winge, Cedar, Atlas, Sitka, Elsinore, Osprey, Prince George, and other vessels were in the vicinity of said rock, ready and willing to take the passengers to places of safety, but the petitioner refused to allow the passengers to leave said steamship Sophia, although urgent demands were made therefor; that at 4 p. m. October 24th, a violent storm arose in Lynn Canal, with a strong north wind, and at high tide, about 6 p. m., the wind and waves drove said vessel over and across the reef causing her to founder; that it had been generally known for many years that during the fall and winter months violent storms arose suddenly in Lynn Canal with little warning, and that petitioner well knew that such storms were likely to arise at any time, and in case of such storm the Princess Sophia would be driven from the reef and would founder; that notwithstanding this fact petitioner decided to keep and require all passengers to remain upon the Sophia until they could be taken therefrom by the Princess Alice; that the Princess Sophia was unseaworthy when she left Skagway, and that she was not equipped with sufficient lifeboats, life preservers, or life-saving appliances as required by law, and that the crew were insufficient in numbers, and were incompetent and not able-bodied seamen; that many of the crew were sick and unable to perform their duties; that said vessel did not carry pilots; that she was insufficiently manned, equipped, and not provided with a full and complete crew to perform their duties; that Captain Locke, master of the steamship, was 67 years of age, and was not given sufficient pilots, and required to stand long watches, and was under great mental and physical strain, and had become weakened physically and mentally, and was addicted to the use of alcoholic liquors to excess, and was under the influence of liquor on said voyage; that he had become incompetent, and not a safe master, all which was known to petitioner.
"Charges of incompetence and unfamiliarity with the waters of Lynn Canal, carelessness and inefficiency, and disqualification were made against the officers of the petitioner, of which the petitioner had knowledge; that the compass and the barometer on the steamship were not in good order and condition; that the compass had not been tested or [the ship] swung for a long time, and the barometer did not correctly indicate atmospheric pressure and change in weather; that all of the acts of negligence, incompetence, and unseaworthiness were known to the petitioner, and that the petitioner was at fault and guilty of gross negligence in connection with the loss and foundering of said steamship.
"The petitioner replies, placing at issue all of the allegations of the affirmative matter, and asserts affirmatively that its managing or supervising officer or agents had instructed the navigating officers and employees connected with the navigation of its steamers, including the steamship Princess Sophia, to navigate and operate said steamers in a cautious and careful manner, and under no circumstances to operate the same in a manner contrary to law and the rules of navigation; that written instructions were furnished to the navigating officers of all the vessels, cautioning them against running risk which by any possibility might result in accident, and to bear in mind that the safety of life and property intrusted to their care is the ruling *343 principle by which they must be governed in the navigation of their ship, and that no saving of time on their voyage is to be sought at the risk of accident; in thick foggy weather and in storms speed must be reduced, and, if soundings are to be had, lead is to be used, and the whistle must be blown at short intervals as prescribed by law; that at least two officers must be on the bridge and a double lookout kept, all water-tight compartments closed, and all possible precautions taken. Such notices were delivered to the officers navigating the steamship Princess Sophia.
"It is admitted that after the stranding a wireless message was sent by Captain Locke to Captain Troup, manager of the British Coast Steamship Service at Victoria, who was operating said vessel, advising Captain Troup that such vessel had stranded, which message was received at about 9:11 o'clock a. m. October 24th at Victoria. It is admitted that Lowle, agent at Juneau, received a message from the wireless operator at Juneau at about 2:15 a. m. (3:15 ship's time) on October 24th, advising him that the said vessel had stranded on Vanderbilt reef, and was calling for help, and that about 3 o'clock a. m. Lowle received a further message from the wireless operator at Juneau to the effect that the Sophia was pounding heavily and was lowering her boats; it is stated that, since all lives on board were lost, petitioner was not advised as to the conditions existing at and in the vicinity of Vanderbilt reef and on board the vessel at the time she stranded, but from the information conveyed to it by wireless, the lives of the passengers were placed in peril; that the Sophia was in command of a competent and experienced master and officers and crew, and that the advisability as to what should be done with relation to the removal of the passengers were matters to be determined by the master, officers, and crew, who had opportunity to consult with the passengers, many of whom were experienced seamen; that upon the petitioner's direction the Peterson, with a capacity of 150 or 200 passengers, arrived on the scene at 9 a. m. October 24th, the Estebeth, with a capacity of from 85 to 150 passengers, arrived at 10 a. m. the same day, the Amy, with a capacity of 150 passengers, arrived at 11:20 a. m. October 24th, the King & Winge, with a capacity of 100 passengers, arrived at 6:20 p. m. the same day, and the Cedar, with a capacity of 400 passengers, arrived at the rock at 8 p. m., and the Lone Fisherman, Sitka, and Elsinore, with total capacity of 350 to 400 passengers, arrived at the scene the afternoon and evening of October 24th; that there were no other vessels in the vicinity of Juneau capable of rendering any assistance; and it is further alleged that if there was any fault on the part of any one in the removal of the passengers from the stranded ship, such failure was due to an error in judgment on the part of the navigating officers, and was without privity or knowledge or fault of the petitioner or any of its managing officers or agents. It admits that on the afternoon of October 25th a violent storm was raging in Lynn Canal, and alleges that such storm had been raging throughout the 24th and 25th. It specifically denies that it or any of its officers or agents decided to require the passengers to remain on board the stranded ship awaiting the arrival of the steamship Princess Alice.
"Upon motion and stipulation of the parties a commissioner was appointed to take testimony at various places in Alaska and in the city of San Francisco. The issue was finally presented on testimony taken in open court, and at the conclusion was submitted upon such testimony and depositions taken." Petition of Canadian Pac. Ry. Co. (D. C.) 278 F. 180, 182-185.
From the foregoing statement, it will be seen that the disaster occurred fourteen years ago and that the petition for limitation of liability was filed but a few months later. Yet the record in this case was not received by this court until April 15, 1931, more than a dozen years after the petition was filed. The parties consumed those dozen years litigating various phases of the case before the commissioner and the lower court.
Aside from the fact that the apostles, the transcribed oral arguments, and the briefs in this case consist of more than 8,500 printed or typewritten pages, exclusive of the voluminous exhibits, our work has been made more difficult by reason of the fact that counsel are in sharp disagreement as to the facts, and in their briefs accuse each other of bad faith and unprofessional conduct. As a result, we have been compelled to examine the record more thoroughly than otherwise would have been necessary. It is unfortunate that the court could not have had the temperate argument that the record requires and the importance of the case demands. When counsel accuse one another of bad faith, naturally the court is unable to accept the assertions in the briefs at their face value, and can, of necessity, take nothing for granted.
In the instant case, this court was very *344 generous to counsel. After the main briefs  and they were voluminous  had been printed, the court permitted the appellants to submit a "supplemental argument," and the appellee to reply thereto. In addition to all of this, the appellants filed an "answer to appellee's supplemental brief." Finally we were furnished with a transcript of the oral argument. These many briefs and arguments resulted in repetition of matters contained in the original briefs, with very few really new points discussed.
To assist in arriving at a clear understanding of the issues in this case, we are supplementing the statement of the lower court, supra, with a number of other facts brought out in evidence.
Capt. J. W. Troup was manager of the British Columbia Coast Service of the Canadian Pacific Railway Company, with general supervision over the service; and Capt. C. D. Neroutsos was marine superintendent and assistant to the manager. Both had their headquarters at Victoria, British Columbia. F. F. W. Lowle was the company's freight and passenger agent at Juneau, and, according to Capt. Troup, "was the highest authority * * * that the Canadian Pacific had in Alaska."
While estimates of the number of persons aboard the Sophia vary, it is probable that the number was approximately 350.
The complete story of the Sophia disaster cannot be told without reference to the various radiograms that were sent to and from the stricken vessel after she hit Vanderbilt Reef. We transcribe below, chiefly directly from the exhibits themselves, a few of the more significant messages:
"Oct. 24, 1918 [Received at 9:11 am.] "Troup, Victoria, B. C.
"Princess Sophia ran on Vanderbilt Reef Lynn Canal at 3 o'clock. Ship not taking any water. Unable to back off at high water. Fresh northerly wind. Ship pounded [pounding?]. Assistance on way from Juneau.
 "Locke."
"Oct. 24th, 1918 [Filed at 9:50 a. m.]
"Capt. Locke, S.S. Princess Sophia.
"Boats Peterson, Amy, Estebeth and Lone Fisherman sent in order given. Were only ones available immediately. King and Wing leaves here at eleven this morning. Nothing else possible of any size. Jefferson returned Seattle from Swanson Bay. Advise me relative disposition passengers for suitable arrangements here.
 "Lowle."
"Oct. 24, 1918 [Sent 10:05 a. m.; transmitted by `Cedar' to Sophia 8 a. m., October 25.]
"Capt. Locke, Princess Sophia, Vanderbilt Reef, Juneau.
"Report what assistance you have secured, also conditions at this low water. Do you think that she will back off at next high water. Advise disposition of passengers.
 "Troup."
"Oct. 24, 1918 [Received at 1:29 p. m.,
 October 25.]
"Capt. J. W. Troup, CPR, Victoria, B. C.
"Have sent several boats Sophia. Government Boat Peterson at wreck now. Advise promptly relative plans for taking passengers south. No other sailings south bound available for two weeks.
 "Lowle."
"24th Oct. * * * [Filed at 10:45 a. m. (?)]
"Mr. Lowle, Juneau, Alaska.
"Send all possible assistance to Sophia. Advise as to what you have been able to do for passengers.
 "J. W. Troup."
"Oct. 24, 1918. [Received 4:23 p. m.]
"Troup, Victoria, B. Col.
"Sophia fast on reef, resting safely. Strong northerly wind. Unable to transfer passengers until wind moderates or perhaps at high water. Steamer Peterson and two gas boats standing by.
 "Locke."
"Oct. 24, 1918. [Received 2:11 p. m.]
"Lowle, Juneau.
"Can't get passengers off. Too much sea for boats. Ship resting safe.
 "Locke."
 "October 24, 1918, 4:30 P. M.
"Captain, Sophia.
"Wire conditions regarding taking off passengers tonight. Hope to arrive reef 8:30 p. m. Thick snow.
 "Leadbetter."
Capt. Leadbetter was master of the U. S. S. Cedar.
"4:45 P. M. * * *
"Captain Leadbetter, U. S. S. Cedar.
"Impossible to get passengers off tonight, as sea is running too strong. Will probably be able to get them off early morning. Strong tide.
 "Locke."
*345 "Oct. 24, 1918 [Received at 11:29 p. m.] "Troup, Victoria, B. Col.
"Ship sitting firmly on reef. Unable to transfer passengers on account of strong N. W. sea. Ship pounding heavily. Cannot get off without salvage gear.
 "Locke."
October 24, 1918, 11:45 p. m.  Lowle's memorandum of "telephone conversation from the wireless station" at Juneau, conveying message from the Princess Sophia: "Will make effort to take passengers off at four a. m. on Cedar."
October 25, 1918, 12:40 a. m.  memorandum of Lowle's conversation with Juneau wireless, as above: "Cannot say until four a. m. whether Atlas can be of any assistance."
"Oct. 25, 1918. [Received 10:10 p. m.] "F. F. Lowle, Juneau.
"You have not replied to my wires. Please make every effort get suitable boats to Sophia for transferring passengers moment it is safe. Alice should arrive Juneau Saturday night [October 26]."
 "J. W. Troup."
"[Oct. 25, 1918]. [Received by the Cedar
 from the Sophia at 1 p. m.]
"Capt. Troup, Victoria.
"Steamer Cedar and three gas boats standing by. Unable to take off passengers account strong northerly gale and big sea running. Ship hard and fast on reef, with bottom badly damaged, but not making water. Unable to back off reef. Main steam pipe broken. Disposition of passengers normal.
 "Locke."
 "7:48 p.
"[October 25, 1918. Sent 1:30 p. m.; received
 7:35 p. m.]
"Lowle, Agent [Juneau].
"Can't do anything until weather moderates. Cedar and King and Winge standing by. How is weather at Juneau.
 "Locke."
 October 25, 1918.
S O S from the Sophia, picked up by the Cedar at 4:50 p. m.
"For God's sake hurry; we are foundering on the reef."
 October 25, 1918.
S O S from the Sophia, picked up by the Cedar at 5:20 p. m.
"For God's sake hurry, the water is coming in my room."
From the foregoing messages, as well as from others that we have examined but are not quoting, it is apparent that the reason for Capt. Locke's failure to lower the lifeboats and transfer the passengers was not any inherent defects in the boats themselves, but the roughness of the wind and sea. Many of the other records are from disinterested parties, such as the radio operators at the Juneau station, as reported in the log introduced in evidence in this case.
The court below denied the appellee's claim of exemption from all liability in connection with the foundering, and, on the contrary, "affirmatively found * * * that the proximate cause or causes of the disaster * * * were the failure to maintain a proper lookout on the steamship * * * and the excessive speed of said vessel at the time she stranded on Vanderbilt Reef." That portion of the decree finding the appellee guilty of primary negligence, and denying to it exemption from liability on that ground, has not been made the subject of a cross-appeal.
Accordingly, the principal question now before this court is the appellee's right to limitation of liability, on the ground of its asserted lack of privity or knowledge of any act or acts of negligence contributing to the loss of lives.
Section 4283 of the Revised Statutes of the United States (46 USCA § 183) reads as follows: "The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."
The foregoing provision applies to passengers. This point was settled in the leading case of Butler v. Boston & Savannah Steamship Company, 130 U. S. 527, 552, 9 S. Ct. 612, 617, 32 L. Ed. 1017, hereinafter to be referred to as the Butler Case: "We think that the law of limited liability applies to cases of personal injury and death as well as to cases of loss of or injury to property."
Section 4283 confers a right that may be enjoyed by foreign as well as domestic ship-owners. In The Scotland, 105 U. S. 24, 31, 26 L. Ed. 1001, referred to with approval in La Bourgogne, 210 U. S. 95, 115, 28 S. Ct. 664, 52 L. Ed. 973, the Supreme Court said: "But it is enough to say, that the rule of limited *346 responsibility is now our maritime rule. It is the rule by which, through the act of Congress, we have announced that we propose to administer justice in maritime cases. We see no reason, in the absence of any different law governing the case, why it should not be applied to foreign ships as well as to our own, whenever the parties choose to resort to our courts for redress. Of course the rule must be applied, if applied at all, as well when it operates against foreign ships as when it operates in their favor."
The reason given by the Supreme Court and by other courts for the enactment of the law limiting the liability of the owner to the value of the vessel and freight then pending was to encourage American shipbuilding. Manifestly, however, this reason cannot apply to the limitation of the liability of the owners of foreign ships. Nevertheless, the statutes and the decisions compel the conclusion that, where no privity or knowledge can be imputed to him, the owner, whether American or foreign, is entitled to limitation of liability.
When the owner is a corporation, the privity or knowledge must be that of its managing officers. Craig v. Continental Insurance Co., infra, at page 646 of 141 U. S., 12 S. Ct. 97, 35 L. Ed. 886; The Galileo (C. C. A. 2) 54 F.(2d) 913, 915; Wessel, Duval & Co. v. Charleston Lighterage & Transfer Co. (D. C.) 25 F.(2d) 126, 129.
There is no dispute that there had been issued by the Canadian Pacific Railway Company ample rules as to navigation, boat drills, water-tight doors, and other matters relating to safety.
In La Bourgogne, supra, at pages 126, 127, of 210 U. S., 28 S. Ct. 664, 675, the court said, in language closely applicable here: "The petitioner having shown the promulgation of regulations for the conduct of its business, which exacted a compliance by the captains of its vessels with the international rules, we think the burden of proving that the rules were not promulgated in good faith or that a wilful departure from their requirements was indulged in, and was brought home to, or countenanced by, the petitioner, was cast upon the claimants, and that the court properly held that that burden was not sustained by the evidence."
The owner of a passenger vessel, of course, may not relieve himself of all liability, or limit his liability, to passengers, merely by purchasing a vessel, without any examination by him to ascertain whether it is in fact seaworthy, or whether it is properly equipped in accordance with law. In other words, the mere purchase of a ship and the delivery thereof by the owner to the master, is not a compliance with the law, and does not entitle him to limit his liability for injury to passengers resulting from defects in the structure or the equipment of the vessel. It is the owner's duty in the first instance to see that the vessel is properly equipped and seaworthy. According to the testimony, the Princess Sophia was purchased by the owner in Scotland, and was designed for carrying passengers in the coastwise trade between Alaska and the states. The mere delivery of that vessel to the master, without more, would seem to be insufficient to exonerate the owner from liability if it was unseaworthy at the time of the delivery, including the matter of projectiles and lines, and also the number of lifeboats and their equipment. This, of course, is wholly independent of that duty with respect to the manning of the vessel. The owner might be entitled to limited liability so far as manning is concerned, if he intrusts that to subordinate officers or agents. But he must prove that he was not privy to the failure of the master to secure the proper and requisite number of qualified seamen.
There is nothing to indicate that the master had knowledge of the qualifications of any passengers to man the lifeboats, or that they were experienced in that line of work.
But the appellants contend that the appellee is not entitled to limitation of liability because the Sophia did not carry all the life-saving appliances prescribed by R. S. § 4488, as amended by section 14 of the so-called La Follette Seamen's Act, passed March 4, 1915 (46 USCA § 481). From the premise of this alleged violation, the appellants proceed to the conclusion that the appellee is precluded from setting up lack of privity or knowledge. No case is cited in support of this proposition, and we do not believe that it can be sustained. In American-Hawaiian S. S. Co. v. Pacific S. S. Co., 41 F.(2d) 718, 720, this court said: "And where the owner of a vessel has properly delegated duties with respect to her management to a competent person, and there is here no contention that the master of the Admiral Fiske was not competent, something more is required in establishing knowledge and privity as to violations of statutes or regulations than mere negligence as to discovering whether or not those duties have been properly carried out; some degree of actual knowledge or participation must be brought home to the owners. [Cases cited]."
*347 Failure to obey a statute does, indeed, penalize the violator. The penalty, however, is not that the violator is to be held accountable for any mishap, regardless of its relation to the violation. The rule simply is that the violator is penalized with the burden of showing that the violation not only probably did not cause the accident, but that it could not have done so. This burden it is frequently extremely difficult, if not impossible, for the violator to discharge, in the nature of things; and therein lies the true penalty imposed upon him. A full discussion of this question is to be found in Puget Sound Navigation Company v. Hans Nelson, 59 F.(2d) 697, decided by this Court on June 24, 1932.
As to Canadian law, however, this point is not material, since we do not find that there was any violation of the Canadian law as to equipment or manning, which could have contributed to the disaster.
But it is seriously urged by the appellants that the Sophia violated a number of provisions of American law as to life-saving appliances, including line-carrying projectiles, lifeboats, and life-saving gear, as well as to the manning of the lifeboats, strength of davits, condition of the radio service, and the sufficiency of the crew in general. The facts as to these particulars become immaterial if we find that the Princess Sophia was not subject to the life-saving requirements laid down by American statutes.
In support of their contention that section 14 of the La Follette Act, supra, does apply to foreign ships, the appellants point to the following clause in that section: "Provided, That foreign vessels leaving ports of the United States shall comply with the rules herein prescribed as to life-saving appliances, their equipment, and the manning of same."
The foregoing proviso was fully construed by Attorney General Gregory, in a well-considered opinion handed down on August 25, 1915, but five months after the passage of the La Follette Act, and appearing in 30 Ops. Attys. Gen. 441, 442. Reporting to the President, Mr. Gregory said: "I am of opinion that when not actually carrying passengers neither foreign cargo nor foreign passenger steam vessels are subject to the provisions of this section. Only foreign private steam vessels carrying passengers from any port of the United States to any other place or country are so subject. To this latter rule, however, an exception must be noted in favor of a vessel belonging to a country whose inspection laws at the time of the voyage approximate our own and which accords to our vessels like privileges of home inspection: Provided such vessel is (1) possessed of an unexpired inspection certificate properly issued under and evidencing compliance with such foreign laws, or (2) where its certificate so issued has expired, it has properly obtained in lieu thereof from the Secretary of Commerce a special permit to depart from a port of the United States if possessing an unexpired certificate."
Continuing, the Attorney General quoted from R. S. § 4400 (46 USCA § 362), which contains the following proviso: "Provided, however, That when such foreign passenger steamers belong to countries having inspection laws approximating those of the United States, and have unexpired certificates of inspection issued by the proper authorities in the respective countries to which they belong, they shall be subject to no other inspection than necessary to satisfy the local inspectors that the condition of the vessel, her boilers, and life-saving equipments are as stated in the current certificate of inspection; but no such certificate of inspection shall be accepted as evidence of lawful inspection except when presented by steam vessels of other countries which have by their laws accorded to the steam vessels of the United States visiting such countries the same privilege accorded to the steam vessels of such countries visiting the United States. * * *"
The Princess Sophia had conformed to the requirements of the above proviso. In the first place, the Secretary of Commerce and Labor, who had been informed by the Secretary of State that the Canadian authorities would recognize as valid the inspection certificates issued by the United States to American steamers, had ordered that Canadian steamers holding unexpired certificates issued by Canadian authorities should be subject to no other inspection than was necessary to satisfy the inspectors that the condition of the vessel was as stated in the Canadian certificate. The circular promulgating the above order of the Secretary of Commerce and Labor was still in force at the time of the trial in the court below, according to Special Deputy Collector of Customs C. D. Garfield.
Since the proviso sets forth that the reciprocal arrangement is to be effective as to "countries having inspection laws approximating those of the United States," the issuance of such a circular by the Secretary of Commerce and Labor, with respect to Canadian vessels, is clear evidence that the Department had found that the inspection laws of the United States and Canada were approximately *348 the same. Harry C. Lord, United States local inspector, who signed the Sophia's certificate, so interpreted the circular, which he described as "a letter granting to us authority to make an inspection of the Canadian passenger steamers whose inspection approximates that of the United States." Finally, the Sophia's American certificate of examination itself is captioned as being that for a "foreign passenger steamer of country having steamboat inspection laws approximating those of the United States."
Without laboring the point further, we are prepared to hold that the Princess Sophia had complied in all pertinent respects with Canadian law, and that her American certificate of inspection relieved her from further compliance with American law as to life-saving equipment. As we have already stated, she complied in all material respects with the Canadian law as to manning.
As to the Sophia's alleged failure to comply with the American requirements as to manning, we are of the opinion that such failure, if it existed, did not have a causal connection with the disaster.
The contention is made on appeal that the lifeboats were not up to standard in buoyancy. This argument seems to be an afterthought, when considered with the answers and the amended answers of the appellants, in which, while alleging the insufficiency of the lifeboats in number and capacity, they set out that the officers of the petitioner decided to keep the passengers on board the Sophia "in order to save the cost" of removing the passengers to the vessels standing by. Elsewhere, in one of the amended answers, the appellants set forth that the passengers could have been transferred by the use of just two of the lifeboats on the after starboard side. "* * * It became and was the duty of the petitioner, its officers, agents and employees, to take immediate steps to remove all the passengers from said stranded steamship `Princess Sophia' to places of safety, which could have been easily and readily done, by lowering the lifeboats of said steamship * * * down upon said Vanderbilt Reef at low tide, and launching the same to the leeward side of said reef, and allowing the passengers to step down from said steamship * * * upon said reef and into said lifeboats, which could have been readily done and rowed to vessels standing by said wreck and the passengers transferred thereto, or could have been rowed or towed to bays and shores within about three (3) miles from said wreck where all passengers could have been landed without difficulty; or by launching the two after starboard lifeboats from said wrecked vessel into the water and transferring the passengers from said lifeboats to other vessels standing by at any time and by lowering the lifeboats from said steamship `Princess Sophia' at high tide and transferring the passengers therein to other vessels standing by waiting and ready to receive them. * * *"
Identical language is to be found in the affirmative defense forming part of the answers of J. C. Garner, and other claimants.
This confirms the opinion of the steamboat inspectors that the Sophia met the requirements as to the sufficiency and buoyancy of her lifeboats.
The Sophia carried eight steel lifeboats and two wooden lifeboats, with a total capacity of 258 persons. Since no one was saved, the loss of life cannot be attributed to the insufficiency of the lifeboats, in number, buoyancy, or capacity.
In the various answers is found the statement that the Princess Sophia "was insufficiently manned and equipped and was not provided with a full, complete, efficient and competent crew," etc. Considerable emphasis has been laid in the briefs upon this phase of the case. There is some evidence that mere boys were part of the crew, and the lower court, in its opinion, so stated. 278 F. 180, 192. We do not wish to be understood as condoning the practice of intrusting to boys the responsibility of safeguarding human lives; indeed, we desire unequivocally to condemn such a policy.
Be that as it may, we do not believe that the presence of these boys on board the Sophia in any way contributed to the disaster. There were a sufficient number of experienced seamen among the crew, not to mention the passengers, who could have handled at least some of the lifeboats had the elements permitted. Since no lives were saved, the same argument can be applied to the use of these boys as to the alleged insufficiency of the lifeboats; neither contributed to the total loss of life.
Insufficiency of the crew was not a cause of the disaster. Nor can insufficiency or deficiency of lifeboats be causally linked with the foundering. As a matter of fact, however, the Sophia was found by the Canadian inspectors to have been properly equipped.
Capt. Locke told the captain of the Cedar by wireless "that the Sophia's passengers were perfectly safe on board  safer than they *349 would be on board the rescuing vessels, and he had decided to hold them there."
The evidence shows that the wind increased during the afternoon of October 24, and continued to increase during the night. The sea was rougher in the afternoon of that day than it was in the forenoon.
There is considerable testimony as to the opinions of the captains of the boats standing by concerning the advisability of transferring the passengers from the Sophia. We believe that there is nothing to be gained from reviewing this testimony, since it is beyond cavil that the ultimate decision rests with the captain of the ship, and an error of judgment on his part cannot be imputed to the owner.
In this connection, we advert to the testimony of Capt. C. E. Tibbits, who had navigated vessels up and down Lynn Canal for 20 years prior to being a witness in this case. On cross-examination, Capt. Tibbits, who had been called by the appellants, said:
"Q. The first thing to do is to consider the safety of the passengers, isn't it? A. Yes, sir.
"Q. And if it is safe,  if the passengers are safer on the vessel than they would be if an attempt were made to remove them, why the safe course would be to keep them on the vessel, wouldn't it? A. Certainly.
"Q. And that all depends upon the condition of the weather that exists at the time the vessel is stranded? A. Yes, sir; certainly.
"Q. And the condition of the sea, and the condition of the point where the vessel strands. All those matters have to be taken into consideration in determining wherein the safety of the passengers lies? A. Certainly.
"Q. And those are matters which can be best determined by the master and officers in charge of the stranded vessel? A. He is supposed to be the judge of those matters."
To similar effect is the report of W. J. Manahan, officer in charge of the United States Naval Radio Station at Juneau, to the Superintendent of District Communication, at Puget Sound. The report follows in part:
"4. The second officer of the U. S. S. Cedar told me during our conversation that on Friday they perhaps could have taken off the passengers, if they were put into a boat alongside of the Sophia and let drift with the current, but by doing this in all probability many of them would have been lost. If this had been done and some were lost and later the ship held fast, the remainder were taken off the Sophia direct, there would be a blame for the seemingly rash act of taking off the people in a small boat when they could have remained on board and been taken off in a better manner later on. It is the opinion that this was the Captain's idea in keeping his passengers on board. Both the Captain of the Cedar and the King and Winge stated that they would have done exactly as Captain Locke did, keep the people on board.
"5. The general opinion is that Captain Locke cannot be blamed in any way for his actions, and he acted according to his best judgment and lost."
Again, there is the letter found on the body of Private A. W. McQueen, dated Friday, October 25, the same day that the Sophia went down. Surely that unfortunate man, whose last written words indicate that he well realized the plight of himself and his fellow passengers, had no interest in overdrawing the picture. In a sense, McQueen's letter, which was introduced by the appellants themselves, is a voice from the grave.
We quote in part from the dead private's letter, which, from internal evidence, was written at about 9 a. m.:
"Princess Sophia is on a rock, and when we get away is question. It's storming now and we can see only couple hundred yards on account of snow and spray. At three a. m. yesterday she struck a submerged rock at high tide, and for a while there was some excitement but no panic. * * * But we passed through the first real danger point at high tide six a. m., when it was thought she might pound her bottom out on the rocks, and every one settled down to wait for help. We had three tugboats here in the afternoon, but weather was too rough to transfer any passengers.
"The most critical time, nobody except ship officers and we soldiers and a few sailors among crew were told about, was at low tide noon, when captain and chief officers figured she was caught on starboard bow and would hang there while she settled on the port side and astern. They were afraid she would turn turtle, but the bow pounded around and slipped until she settled in a groove, well supported forward and on both sides. The wind and the sea from behind pounded and pushed her until she is now, thirty hours afterwards, on the rocks clear back to the middle and can't get off. She is a double bottom boat and her inner hull is not penetrated, so here we stick. She pounds some on a rising tide. * * *"
*350 Regardless of what we might think that Capt. Locke should have done, under all the circumstances of the situation, he was in full charge of the vessel and was shown to have been a competent and careful navigator. His opinion of the situation is best expressed in the wireless messages which were sent by him after the vessel stranded. Those messages have already been set out.
The responsibility of navigating the ship and selecting and directing the crew rests upon the captain. In the Butler Case, supra, at page 554 of 130 U. S., 9 S. Ct. 612, 618, the Supreme Court said: "By virtue of his office, and the rules of maritime law, the captain or master has charge of the ship and of the selection and employment of the crew. * * *" See, also, American-Hawaiian S. S. Co. v. Pacific S. S. Co. (C. C. A. 9) supra, at page 720 of 41 F.(2d), and The Lusitania (D. C.) 251 F. 715, 728.
Some of the claimants' witnesses testified that in their opinion the passengers could have been safely transferred to the vessels standing by, while other witnesses produced on behalf of the appellee expressed a contrary opinion. Capt. Leadbetter, master of the Cedar, stated that "it looked like suicide to attempt" to remove the passengers on the 25th. The fact remains, however, that Capt. Locke, whose judgment, according to the law of the sea and the holdings of the courts, was final, decided to await the coming of more favorable weather before making the transfer.
As was well said by Judge Mayer, in The Lusitania, supra, at page 728 of 251 F.:
"The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of the captain of a vessel must be confined in a mental strait-jacket. * * *
"After a disaster has occurred, it is not difficult for the expert to show how it might have been avoided, and there is always opportunity for academic discussion as to what ought or ought not to have been done; but the true approach is to endeavor, for the moment, to possess the mind of him upon whom rested the responsibility."
From an examination of the logs of the various vessels and radio stations interested in the Sophia's plight, as well as from a study of the other exhibits and the voluminous apostles, it seems to be conclusively established that nothing could be done for the stricken steamer because of the weather conditions. This conclusion is substantiated by the radiograms from Capt. Locke and from the ships standing by the Sophia, which show the reasons why the passengers were not taken off. These reasons were the condition of the weather and the fact that Capt. Locke, sustained by the captains of the ships standing by, and believing that the boat would stay on the reef and that she was safe, decided to await more favorable weather.
In our opinion, it is conclusively established that the terrible loss was not suffered by reason of improper or inadequate equipment. The master, under all the circumstances of the situation, was doing what he believed to be for the best of all concerned. An examination of the record, including the many exhibits received in evidence, leads us to this conclusion.
In their pleadings, the appellants have repeatedly asserted that Capt. Locke "had become addicted to the use of alcoholic liquors to excess, and was under the influence of liquor on said voyage, and that by reason thereof had become incompetent, deficient and not a safe master to have the navigating of said vessel as aforesaid, all of which was well known to the petitioner, its said officers, agents, servants and employees." We find no testimony in the record sustaining this charge. During the oral argument before this court, one of the proctors for the appellants, who had not, however, drawn up the pleadings, said: "Let me say this  there has never been yet to sea a master that was any better experienced or had greater knowledge of the trip upon which he was operating than Captain Locke."
The allegations of the pleadings and statement of counsel are somewhat contradictory. Capt. E. A. McDougall, master of the gas boat Amy, testified that, through a megaphone, Capt. Locke advised him to go into the harbor, since the sea was getting bad and the Amy was "hard to handle." Surely this was not the advice to be expected from a man under the influence of intoxicants; nor is it likely that Capt. Locke could have been intoxicated at the time without McDougall's noticing it.
George M. Simpkins, deputy collector and inspector of United States Customs Service at Juneau, testified that he thought he was "the last one to see Captain Locke" on the night the Sophia "pulled out for Skagway," from Juneau. "He was all right as far as I know," Mr. Simpkins testified, adding that he *351 did not notice anything wrong with him, either mentally or physically, at that time.
It is claimed by the appellants that the petitioner's managing officers intended to keep the passengers of the Sophia on board the steamer until such time as the Princess Alice, another of its vessels, could arrive at the scene, and then have the passengers transferred to the latter. To sustain this assertion, the testimony of Capt. C. W. Call, pilot on the Atlas, is pointed to by the appellants. Capt. Call testified that Capt. Thomsen, the master of the Atlas, showed him "a wire from the Sophia to the captain of the Atlas saying that the Princess Alice was leaving Vancouver to take off passengers; ship resting easily; your assistance not required."
This inference is hardly warranted, in the light of the testimony of the officials of the company, to the effect that no order was ever given to the Princess Alice to proceed to the wreck. On the contrary, she was ordered to "go to Juneau direct and report to" Lowle, as may be seen from the following three messages sent by Capt. Neroutsos:
 "Victoria, B. C. Octr. 24th, 1918.
"Capt. Slater, `Princess Alice,' Vancouver.
"Confirming instructions through Mr. McGown's office, you will clear for Ketchikan direct, thence to Juneau for `Princess Sophia's' passengers, reporting to Lowle for further instructions. Please take no chance and keep us posted by wireless from time to time.
 "C. D. Neroutsos."
 "Victoria, B. C., Octr. 24th, 1918.
"F. F. W. Lowle, Juneau, Alaska.
"`Princess Alice' leaving Vancouver 11:00 P. M. for `Princess Sophia's' passengers. She will go to Juneau direct and report to you.
 "C. D. Neroutsos."
 "Victoria, B. C., Octr. 24th, 1918.
"Capt. Locke, `Princess Sophia.'
"We are sending `Alice' from Vancouver direct to Juneau to report to Agent Lowle for your passengers. She leaves tonight at eleven.
 "C. D. Neroutsos."
Furthermore, it is extremely doubtful even that Capt. Locke himself ever sent a message to the tanker Atlas, informing her captain that the Princess Alice was on her way "to take off passengers" aboard the Sophia. The documentary evidence all points the other way. J. C. Rohlfs, manager of the marine department of the Standard Oil Company of California, which operated the Atlas, while on the witness stand giving a deposition, read what he said were, so far as he knew, "all of the messages which Captain Thomsen copied and left in this office." The pertinent messages follow:
"10/24/18  7:50 P. M. S.O.S. Princess Sophia. 270 passengers."
"10/24/18  8: P. M. Give me your position. Do you need any assistance.
 "S. S. Atlas."
"10/24/18  8:15 P. M. To Atlas. We ran ashore on Vanderbilt Reef off of Sentinel Island in Lynn Canal about thirty-five miles from Juneau at three A. M. but do not need assistance now as U. S. S. Cedar N. L. W. is standing by.
 "Locke."
To the same effect are the two logbooks of the Atlas, covering the date in question, the pilot house logbook and the ship's log. In each of those books the following entry appears, with but an immaterial transposition of words and a misspelling of the master's surname in the ship's log:
"S.O.S. 7:50 P. M. Princess Sophia 250 passengers. Atlas answered offering assistance. 8:15 Sophia answered No assistance required `Cedar' standing by.
 "Dan W. Thomsen."
Finally, it would be very strange that a message from Capt. Locke mentioning the Princess Alice should be sent to the Atlas without being picked up by some wireless station, especially in view of the copious logs that seem to have been kept by the operators in that vicinity.
In our opinion, the evidence is conclusive that Capt. Locke did not send a message to the Atlas containing mention of the Alice's expected arrival in Alaskan waters.
But any message from Locke, if such was received, refusing aid, was manifestly without the privity of the company, or its managers. It indicated, if anything, merely the captain's error of judgment. He probably thought, as he said in his radiograms, that there were a sufficient number of boats standing by which could be used, when conditions were suitable, for the transfer of passengers.
It is undisputed that the Atlas received the distress call of the Sophia. Capt. Call, the pilot on the Atlas at the time, testified that he saw a radiogram from the Sophia to the effect that the Atlas' assistance was not required. But it has not been shown that any responsible officer of the company knew anything *352 about this disputed message, or caused it to be sent. Capt. Locke himself, acting according to his best judgment, thought that the assistance of the Atlas was not necessary, and so advised her. Hence, even if the testimony of the pilot is true, still the responsibility for declining help from the Atlas was assumed by Capt. Locke; and, under the authorities, his error of judgment  the company not being privy to his failure to avail himself of offered assistance  does not preclude the owner of the Sophia from seeking the benefit of the law limiting its liability.
Manahan's report to his chief, which, as we have seen, gave the "general opinion" as being "that Captain Locke cannot be blamed in any way for his action, and that he acted according to his best judgment and lost," represents the contemporaneous impression of one not directly connected with the transaction. It seems to express the same opinion as that held by Capt. Locke and those other veterans of the sea, whose duty it was to size up such situations and act for the best interests of all concerned.
There is testimony tending to show that Lowle told certain persons that the Princess Alice had been ordered to proceed to the Sophia to take off the latter's passengers; but, regardless of whether Lowle so understood, the fact remains that no such orders were ever given, as the foregoing messages sent and the testimony of Capt. Troup clearly show. Capt. Troup testified as follows:
"Q. Captain, did you ever issue any orders that the Alice was to go to the Princess Sophia direct? A. No, sir, there was never any such orders issued.
"Q. Was there ever any such intention in your mind? * * * A. No, sir, there was never any such intention in my mind.
"Q. Did you ever issue any instructions either to Captain Locke or any officer of the Sophia to hold the passengers on the Sophia? A. No, sir.
"Q. Did you ever give Captain Locke any instructions whatsoever in connection with the Princess Sophia after she went on the reef,  did you attempt to instruct him what he should do? A. No, sir. He was on the ground."
We think that the lower court was correct in its conclusion that Lowle was not such a managing agent of the company as is referred to in the statute. But, if he had been such, it would not change the result, because the knowledge that he acquired of the situation of the Sophia after her standing, and of the passengers thereon, would not have justified him in dictating to Locke as to what should or should not be done. For by so doing, Lowle would have divested Capt. Locke of that discretion which the law confers upon the master in emergencies of the character in question. The record does show that, after Lowle was informed of the situation as it existed, he did everything that could be done to co-operate with Locke and furnish all possible assistance to the stranded vessel and her passengers.
Having found that there is nothing in section 4283 that prevents the appellee, under the facts of this case, from obtaining a limitation of liability, we next advert to the second major contention of the appellants, namely, that, regardless of the question of privity, the shipowner is liable for injury to passengers "occurring through neglect or failure of the owners to comply with the provisions of law." In support of this argument, the appellants cite R. S. § 4493 (46 USCA § 491), which reads as follows: "Whenever damage is sustained by any passenger or his baggage, from explosion, fire, collision, or other cause, the master and the owner of such vessel, or either of them, and the vessel shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect or failure to comply with the provisions of this or the preceding chapter or sections 214 or 215, or through known defects or imperfections of the steaming apparatus or of the hull; and any person sustaining loss or injury through the carelessness, negligence, or willful misconduct of any master, mate, engineer, or pilot, or his neglect or refusal to obey the laws governing the navigation of such steamers, may sue such master, mate, engineer, or pilot, and recover damages for any such injury caused by any such master, mate, engineer, or pilot."
Much space is devoted in the briefs to a discussion of the question of whether or not the foregoing section applies to foreign vessels. As we read the decisions of the Supreme Court, a determination of this question is unnecessary, since that tribunal has held that there is no essential difference between the provisions of sections 4283 and 4493.
In the Butler Case, supra, at page 553 of 130 U. S., 9 S. Ct. 612, 617, Mr. Justice Bradley said: "By the forty-third section (Rev. St. § 4493 [46 USCA § 491]) it is declared that whenever damage is sustained by a passenger or his baggage the master and owner, or either of them, and the vessel, shall be liable to the full amount of damage, if it happens *353 through any neglect or failure to comply with the provisions of the act, or through known defects, etc. This is only declaring in the particular case what is true in all, that if the injury or loss occurs through the fault of the owner, he will be personally liable, and cannot have the benefit of limited liability. * * * If, in those proceedings, it should appear that the disaster did happen with his privity or knowledge, or, perhaps, if it should appear that the requirements of the steamboat inspection law were not complied with by him, he would not obtain a decree for limited liability. That is all. We say `perhaps,' for it has never yet been decided, at least by this court, that the owner cannot claim the benefit of limited liability when a disaster happens to a coastwise steamer without his fault, privity, or knowledge, even though some of the requirements of the steam-boat inspection law may not have been complied with."
The Butler Case, supra, indicates that sections 4283 and 4493 are simply different statements of the same rule.
The Butler Case has been quoted by the Supreme Court, on this and on other points, too often to leave room for doubt that it is still the law of the land. In Richardson v. Harmon, etc., 222 U. S. 96, 105, 32 S. Ct. 27, 30, 56 L. Ed. 110, the Supreme Court quoted from page 549 of 130 U. S., 9 S. Ct. 612, 616, of the Butler opinion, as follows: "If we look at the ground of the law of limited responsibility of shipowners, we shall have no difficulty in reaching the conclusion that it covers the case of injuries to the person as well as that of injuries to goods and merchandise. That ground is, that for the encouragement of shipbuilding and the employment of ships in commerce, the owners shall not be liable beyond their interest in the ship and freight for the acts of the master or crew, done without their privity or knowledge. It extends to liability for every kind of loss, damage, and injury. This is the language of the maritime law, and it is the language of our statute, which virtually adopts that law."
Among the cases citing or quoting the Butler Case, supra, with approval, as to the purpose of section 4283, or as to other points, are Craig v. Continental Insurance Co., 141 U. S. 638, 645, 12 S. Ct. 97, 35 L. Ed. 886; White v. Island Transportation Company, 233 U. S. 346, 350, 351, 34 S. Ct. 589, 58 L. Ed. 993; The Titanic, 233 U. S. 718, 732, 34 S. Ct. 754, 58 L. Ed. 1171, L. R. A. 1916B, 637; Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 336, 39 S. Ct. 292, 63 L. Ed. 631; Panama Railroad Co. v. Johnson, 264 U. S. 375, 387, 44 S. Ct. 391, 68 L. Ed. 748; In re East River Co., 266 U. S. 355, 368, 45 S. Ct. 114, 69 L. Ed. 324; Hartford Accident & Indemnity Co. v. Southern Pacific Co. et al., 273 U. S. 207, 215, 47 S. Ct. 357, 71 L. Ed. 612; Crowell, etc., v. Benson, 285 U. S. 22, 39, 52 S. Ct. 285, 76 L. Ed. 598. An examination of these cases will convince the student that several of them are affirmatively in accord with the views herein expressed, and that none are contrary thereto.
We are quite aware that in Sherlock et al. v. Alling, etc., 93 U. S. 99, 106, 23 L. Ed. 819; The Annie Faxon (C. C. A. 9) 75 F. 312, 318; Hines, etc., et al. v. Butler et al. (C. C. A. 4) 278 F. 877, 881, certiorari denied 257 U. S. 659, 42 S. Ct. 185, 66 L. Ed. 421, there may be found expressions inconsistent with our holding on this point. We believe, however, that the more recent decisions of the Supreme Court indicate that section 4493 is not to be taken as stating an exception to the general rule of limited liability, as expressed by section 4283, but that it merely sets forth in particular phrase what is already provided for in general language by section 4283.
Our belief that such is the interpretation placed upon these two sections by the Supreme Court is strengthened by the reflection that the law of limited liability is to be construed liberally in favor of the shipowner. In Providence & New York Steamship Co. v. Hill Manufacturing Co., 109 U. S. 578, 588, 589, 3 S. Ct. 379, 617, 27 L. Ed. 1038, quoted in La Bourgogne, supra, at pages 120, 121 of 210 U. S., 28 S. Ct. 664, 673, the Supreme Court said: "In these provisions of the statute we have sketched, in outline, a scheme of laws and regulations for the benefit of the shipping interest, the value and importance of which to our maritime commerce can hardly be estimated. Nevertheless, the practical value of the law will largely depend on the manner in which it is administered. If the courts having the execution of it administer it in a spirit of fairness, with the view of giving to shipowners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations (as before stated) will be of the last importance; but, if it is administered with a tight and grudging hand, construing every clause most unfavorably against the shipowner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment. Its value and efficiency will also be greatly diminished, if not entirely destroyed, by allowing *354 its administration to be hampered and interfered with by various and conflicting jurisdictions." See, also, 58 C. J. 1104, page 635.
In view of the principles announced in these cases, and of the statutes, which were passed for the purpose of encouraging the building of ships and the assistance that it affords to commercial operations, which seems to be the rule and guide laid down by the Supreme Court in determining cases of this character, and having examined the evidence in this case with those decisions and statutes in mind, we are obliged to affirm the decree of the lower court. We are not called upon to pass upon the wisdom of the enactment of such statutes, or the fairness of them to the passengers on board, but are merely required to announce the law in accordance with the facts contained in the record. Not only have the decisions held that the statutes should be construed liberally for the benefit of the shipowner, but the courts have gone to the extent, in the Norwich Case, 118 U. S. 468, 6 S. Ct. 1150, 30 L. Ed. 134, infra, of holding that the proper construction of the limitation statute does not require the shipowner even to surrender the insurance money received as compensation for the destruction of the vessel.
Regardless of our personal views as to the correctness of these holdings, we are merely following the interpretations placed upon the law by the Supreme Court, which are binding upon us. We are not announcing a new view.
In view of the above holdings, it would seem unnecessary to consider the other assignments of error. However, having carefully read and considered the relevant and material evidence contained in the record, as well as all of the briefs and printed arguments in their entirety, we are prepared to, and do, pass upon all of the other assignments of error, except the one hereinafter referred to.
We think the District Court correctly sustained petitioner's exceptions to certain of the claims of the claimants to whom damages were awarded by the commissioner, on the ground that same had been filed and prosecuted by a foreign administrator. Noonan v. Bradley, 9 Wall. (76 U. S.) 394, 19 L. Ed. 757. No error was committed in refusing to permit the substitution of the local administrator in place of the foreign administrator, nor in sustaining exceptions to certain of the claims filed by the claimants on the ground that same were not filed with the commissioner within a period of two years after October 25, 1918. The filing of a petition for limitation of liability did not stop the running of the statute of limitations.
No error was committed in sustaining petitioner's exceptions to the commissioner's findings and award in estates Nos. 26, 87, 118, and 186 in the commissioner's report, members of the crew, for the reason that certain awards had been made to their heirs by the Workmen's Compensation Board of the province of British Columbia, Dominion of Canada.
No error was committed in sustaining petitioner's exceptions to the claims of the fathers and mothers of the minor decedent passengers allowed by the commissioner. The statute of Alaska requires that such claims be filed by the administrator.
The court did not err in holding that petitioner was not required to surrender and deposit in court the insurance money collected upon the loss of the steamship Princess Sophia. The City of Norwich, 118 U. S. 468, 6 S. Ct. 1150, 30 L. Ed. 134; Butler v. Boston & S. S. S. Co., 130 U. S. 527, 9 S. Ct. 612, 32 L. Ed. 1017. In the latter case the court said (page 558 of 130 U. S., 9 S. Ct. 612, 619): "The question relating to the insurance money received for the loss of the ship and freight has already been settled by our decision in the case of The City of Norwich, 118 U. S. 468, 6 S. Ct. 1150 [30 L. Ed. 134], and requires no further discussion here. This case is governed by that, so far as the claim to the insurance money is concerned."
No error was committed by the trial court in refusing to allow interest on the amounts awarded to certain of the claimants.
The one assignment of error not passed upon is the one relating to the holding and finding of the court that the evidence was not sufficient to sustain the commissioner's findings, and award of damages in favor of a hundred or more claimants in the amounts set forth in the commissioner's report. The court held that the evidence did not prove any pecuniary loss to any of the estates suing, and consequently, under the Alaska statute, noted in margin,[1] no recovery was allowable.
On oral argument of the cause in this court, it was disclosed that, after allowing certain fees and costs, there remains in the hands of the trustee only approximately $600 *355 to be disposed of under the decree of the court that is available for the payment of allowed claims and court costs. During the argument, Judge Wilbur asked counsel for the appellants the following question:
"Do you mean the only fund available here for liability is $600?"
"Mr. Martin. That is it. It is all gone. It is not worth considering at all."
Later, during a discussion between the court and counsel, Judge Wilbur stated:
"Then, we will understand, unless the court, after examining the record, feels otherwise, that it would be unnecessary to examine the question of the relative rights of the claimants as to money questions."
This assumption was not challenged. It is true that, in the supplemental printed argument filed by counsel for the appellants, it is insisted that "the fixing and determining of the amounts found to be due to each of the appellants by this Court is absolutely necessary before a final decree can be entered in this case, irrespective of the amount remaining in the custody of the trial Court for apportionment among the appellants." However, we are disposed to agree with the statement made by counsel on the oral argument, and to treat the assignment with reference to the sufficiency of the evidence to sustain the hundred or more claims as presenting a moot question. Apparently, after the payment of court costs and other costs on appeal, nothing will be left to be distributed among the claimants, and, in the language of counsel, "it is not worth considering at all." If the question really presented any necessity for passing upon the sufficiency of the evidence to sustain those claims, the time element would not influence us, nor cause us to refrain from considering and discussing them in detail; but, in view of what has been said, we think it needless.
We deem it unnecessary to discuss the remaining assignments of error in detail. They have been carefully studied and considered, notwithstanding the decision on the vital question of the right of petitioner to limit its liability. What was said by the Supreme Court in the La Bourgogne, supra, is apposite here: "We have confined the foregoing opinion to those general propositions which we deem essential to dispose of the case. We have hence refrained from expressly noticing many minor points pressed in the voluminous argument submitted at bar. Because we have so done, we have not overlooked, but have considered them all; indeed, have disposed of them all [except one]; as the reasons we have given, when ultimately considered, conclude every contention made."
The decree is affirmed.
NOTES
[1] Compiled Laws of Alaska 1913, § 1185, pp. 484, 485.