## THE DENALI.

### PACIFIC COAST COAL CO. v. ALASKA S. S. CO.

### UNITED STATES v. SAME.
No. 8963.

Circuit Court of Appeals, Ninth Circuit.
June 30, 1939.

414

MATHEWS, Circuit Judge, dissenting in part.

J. Charles Dennis, U. S. Atty., and F. A. Pellegrini, Asst. U. S. Atty., both of Seattle, Wash., for the United States.

T. Catesby Jones, James W. Ryan, and Bigham, Englar, Jones & Houston, all of New York City, and Lane Summers and Hayden, Merritt, Summers & Bucey, all of Seattle, Wash., for appellant Pacific Coast Coal Co. et al.

Lawrence Bogle, Cassius E. Gates, Stanley B. Long, and Bogle, Bogle & Gates, all of Seattle, Wash., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by claimants, owners of cargo shipped on the steamer Denali, from a decree of the district court exonerating the Alaska Steamship Company, the Denali's owner, from liability for the total loss of their cargo in the stranding of that steamer on a submerged reef in the Caamano Passage, British Columbia, on a voyage from Seattle, Washington, to Alaskan ports. The · proceedings commenced in a petition of the Steamship Company, filed September 4, 1935, for the limitation of and exoneration from liability provided by the Limitation Statutes, 46 U. S.C.A. § 183 et seq., and the Supreme Court Admiralty Rules, 28 U.S.C.A. following section 723. Appraisement was duly made of ship and pending freight, a stipulation of their values given, and the jurisdictional requirements of the statute and rules have been complied with.

The cargo claimants seek to establish as error in the decree appealed from its failure to hold (A) that the vessel violated the Act of May 11, 1918, Chapter 72, 40 Stat. 548–550, 46 U.S.C.A. §§ 222, 223, 235, in that the stranding was caused by the negligent navigation of the mate in charge of navigation, who was required by the Steamship Company to serve and, in fact, was serving at the time of the stranding in violation of the "three-watch" division of the mates' period of navigating service required by the statute; (B) that the vessel was unseaworthy because of defective compasses existing at the time of the commencement of the voyage, which a proper inspection would have disclosed, and which defect causatively contributed to the stranding; (C) that the ship was unseaworthy as to her charts, and the absence of a proper chart of Caamano Passage causatively contributed to the collision; (D) that the owner had privity in and knowledge of the violation of the statute with regard to the watch system of the mates and of her unseaworthiness as to compasses and charts and hence was not entitled to a limitation of liability; and (E) that the Steamship Company had failed to use due diligence to make the vessel seaworthy and hence was not entitled to the benefit of the Harter Act, 46 U.S.C.A. § 192.

(B and C) With regard to the cargo owners' charges respecting the compasses and charts, the district court, on conflicting evidence, decided that the vessel was not unseaworthy as to either and that neither the character of the charts nor compasses causatively contributed to the stranding. We so hold.

(A) Regarding the claimed violation of the Act of May 11, 1918, Chapter 72, supra, of the three watch provisions for the Denali's mates, that act makes it unlawful for a vessel to be navigated unless she have a "complement of licensed officers * * * necessary for her safe navigation".[1] It provides: "No vessel of the United States subject to the provisions of this title [chapter or chapters 14 or 15] or to the inspection laws of the United States shall be navigated unless she shall have in her service and on board such *complement of licensed officers* and crew including certificated lifeboat men, separately stated, as may in the judgment of the local inspectors who inspect the vessel be *necessary for her safe navigation*. The local inspectors shall make in the certificate of inspection of the vessel an entry of such complement of officers and crew including certificated life-

---

[1] Just as all the International Rules of Navigation, 33 U.S.C.A. § 61 et seq., are commands to the owner, though in text they are but directions for the navigation of the vessel and do not mention the owner, so here the owner violates the statute if his vessel is navigated without its required complement of officers. Cf. In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 81, 69 L.R.A. 71, where the owner was held liable under a similar statute which made the requirement regarding the officers and crew on the vessel and did not mention the owner.

boat men, separately stated, which may be changed from time to time by indorsement on such certificate by local inspectors by reason of change of conditions or employment. * * *". 46 U.S.C.A. § 222. (Emphasis supplied.)

What constitutes such a complement of mates is provided by Section 2 of the Act, 46 U.S.C. § 223, 46 U.S.C.A. § 223. For a steamer of over 1000 gross tons, such as the Denali, to have a "complement of licensed officers" there must be something more than the mere "number" of mates entered in the certificate of inspection. If the vessel have a "complement" of mates they must satisfy a "scale" requiring that they "*shall stand* in three watches while such vessel is being navigated". Section 2 provides: "That the board of local inspectors *shall make an entry* in the certificate of inspection of every ocean and coastwise seagoing merchant vessel of the United States propelled by machinery, and every ocean-going vessel carrying passengers, the *minimum number* of licensed deck officers required *for her safe navigation* according to the following scale:

"That no such vessel shall be navigated unless she shall have on board and in her service one duly licensed master.

"That every such vessel of one thousand gross tons and over, propelled by machinery, shall have in her service and *on board three licensed mates, who shall stand in three watches while such vessel is being navigated,* unless such vessel is engaged in a run of less than four hundred miles from the port of departure to the port of final destination, then such vessel shall have two licensed mates; and every vessel of two hundred gross tons and less than one thousand gross tons, propelled by machinery, shall have two licensed mates. * * *"

(Emphasis supplied.)

■ The inspectors' statutory duty with regard to the complement requirement of Section 1, as detailed in Section 2, ends in the entry on their certificate of the "minimum *number*" of mates. (Emphasis supplied). The so-called "scale" itself prescribes for the vessel the necessary watch function of the mates when so numbered. The three-watch requirement for the mates would be meaningless as a safety provision if a vessel of over 1,000 gross tons could be considered as having satisfied the statutory duty by having a complement of mates sufficient in number, but who are required by the owner to stand on a two-watch *instead of* a three-watch *division*, when the vessel is being navigated. In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 82, 69 L.R.A. 71.

Apart from the plain phraseology of the Act, we have the administrative practice of the Department of Commerce, shown in its printed forms of its certificates of inspection which provide only for the entry of the number of mates and make no repetition of the statutory command that they shall stand in three watches. That command is directly from the statute to the vessel and her owner.

■ The word "watch" in maritime parlance has two meanings. It refers to the division of the day into time periods of service of the officers and crew, and also to the division of such persons for that service. By immemorial Anglo-Saxon maritime custom, the time period of a watch never exceeds four hours.

■ When a vessel's three mates are divided into three watches in each of which stands but one of three mates, the watch time of each mate will be 8 hours a day, served in watches not exceeding 4 hours each. The Congressional intent was to make impossible the former "watch and watch" system in which the crew was divided into two watches "starboard" and "port", so named because the former had their bunks on the starboard side of the forecastle and the latter on the port side. In the two watch system, the total number of sailors of each grade was divided by two, and if there was an odd man he was assigned to the port watch. The starboard or captain's watch was usually commanded by the captain, though sometimes by the second mate. The port watch was commanded by the first mate. Under the two watch system the crew and officers commanding them stood on watch twelve hours a day.

■ Since the statute itself describes its purposes to be for *safe* navigation, and since there would be no gain in avoiding disaster to the ship from fatigue in her navigating officers were the watches so divided that one of the mates was required to stand twelve hours navigating service in time periods exceeding four hours each, and since by long established custom the work of men on watches is equally divided, we hold that so far as concerns *mates* on

watch and navigating the vessel the statute prohibits her navigation if they serve more than eight hours a day. Cf. O'Hara v. Luckenbach S. S. Co., 269 U.S. 364, 370 et seq., 46 S.Ct. 157, 70 L.Ed. 313.

The three-watch 8 hour limitation is a specific provision for mates while the vessel is navigating. Hence it prevails over a general provision in Section 3 of the Act[2] applying to all licensed officers, limiting their service to 12 hours a day.

The question then is, Did the Denali have a complement of three mates who were to obey the statute and stand in three watches while the vessel was being navigated? The evidence is overwhelming that she did not.

The Denali, as stated by the Steamship Company's brief, had four licensed mates. They were the first, second and third mates, and pilot Obert. Obert is admitted by that brief to have been "used" by the Steamship Company as the fourth mate. It is Obert's and the third mate's watch service time which is of paramount importance here, because Obert was navigating the vessel with the third mate's assistance when the disaster occurred. The first mate stood no regular watch on the voyage in question and this was the custom on the Steamship Company's 19 vessels in the Alaska trade, though he occasionally relieved the Captain and second mate.

As we have seen, the second mate and third mate and the pilot "used" as a mate, each should have served but 8 hours a day. Concerning the former two's actual time of service, the captain testified that the second and third mates were "required" to serve 8 hours in two "compulsory" watches but "customarily" and "voluntarily" they served a longer time in another watch.

This is surprising testimony. Knowing something of the modern sailor and the watchfulness of corporate managers over their labor costs, this maritime court wonders how long the second and third mate would have held their jobs if they failed "customarily" and "voluntarily" to violate

the provisions of this safety statute and in a third or fourth watch period serve over its required time. What this customary violation of the statute consisted of is plainly inferable from the captain's testimony:

"Q. It has been the practice of the Alaska Steamship Company for many years on freighters like this for the master and the pilot to stand alternate watches of six hours, is that right? A. Yes.

"Q. And during the master's watch the second mate stands with him, is that right? A. Yes.

"Q. And during the pilot's watch the third mate stands with him? A. Yes.

"Q. Who was in charge of the watch during the time that the pilot and third mate were on the bridge, that is the, the 6:00 to 12:00 watch? A. The pilot and third mate were not on the 6:00 and 12:00 watch.

"Q. On the 12:00 to 6:00 watch, I should have said. A. On the 12:00 to 6:00 watch the pilot was in charge.

"Q The third mate took orders from the pilot? A. Yes, sir.

"Q. On all subjects? A. Yes, sir.

"Q. And during the 6:00 to 12:00 watch, who was in charge of the watch? A. The master.

"Q. And the second mate took orders from you? A. Yes, sir.

*  *  *

"Q. And then at noon—from noon to 6:00 P. M. on that date, Thursday, May 16, 1935, were Pilot Obert and the third mate on watch? A. Yes, sir, Obert and the third officer."

We conclude that in each 24 hours the second and third mates each in fact stood more than 8 hours watch duty in three or more 4 hour watch periods.

With regard to the remaining mate, that is Pilot Obert, "used" as mate, the testimony is uncontradicted that his watch service was 12 hours a day, stood in two 6 hour periods,—that is to say, in two full

---

[2] "Sec. 3 [§ 234]. That it shall be unlawful for the master, owner, agent, or other person having authority to permit an officer of any vessel to take charge of the deck watch of the vessel upon leaving or immediately after leaving port, unless such officer shall have had at least six hours off duty within the twelve hours immediately preceding the time of sailing, and no licensed officer on any ocean or coastwise vessel shall be required to do duty to exceed nine hours of any twenty-four while in port, including the date of arrival, or more than twelve hours of any twenty-four at sea, except in a case of emergency when life or property is endangered. Any violation of this section shall subject the person or persons guilty thereof to a penalty of $100. 46 U.S.C.A. § 235.

4 hour watch periods and extending 2 hours each into two other 4 hour watches. That is the method in which the ship was navigated and it is a matter of indifference whether it was by compulsion or in part by the acceptance of the owner of a service from the mates which was customary and voluntary. We hold that as to the second and third mates and Obert, the substituted mate, the owner was operating the vessel in violation of the three watch provisions of the statute.

■ The plain intent of the statute is that for a steamer of over 1000 gross tons there shall be at least four officers, the captain and the three mates, who shall share the burden of navigating her. The first mate, we have seen, had no regular navigating watch duty. Here, by the command of the Steamship Company, the vessel was sent on her dangerous voyage with two of the four, the second and third mates, prohibited from navigating her wherever any risk to her was involved. This exclusion of two of the statutory four navigating officers is by an order of the Steamship Company, General Order number 13, issued to all masters:

"To all Masters and Pilots:
                    "April 4th, 1934.
        "General Order.
    "The practice of many of our Pilots leaving the bridge while the ship is under way has resulted in some serious accidents.

    "Effective this date, excepting when the steamer is on the Gulf or in open water, *never leave the ship in charge of second or third officers when approaching land and changing courses. These men are good officers but lack experience.*

    "The Master will see that this order is carried out and fully understood by all concerned.
                "C. A. Glasscock,
                    "Port Captain."
(Emphasis supplied.)

■ The vessel was wrecked by the fault of navigation of the substitute mate Obert, who was "assisted" by the third mate, who acted under Obert's orders. Since both men were serving under a watch system used in violation of the statute, the burden falls on the Denali's owner of showing not merely that the two watch system probably did not but that it *could not* have contributed to the stranding. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; Lie v. San Francisco & Portland ·S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726; The Silver Palm, 9 Cir., 94 F.2d 754, 759; The Eagle Wing, D.C., 135 F. 826, 832, affirmed 4 Cir., 162 F. 882; The Henry O. Barrett, 3 Cir., 161 F. 481, 485, certiorari denied 212 U.S. 573, 29 S.Ct. 683, 53 L.Ed. 656.

As this court, in reviewing and summarizing the cases, has said concerning this extraordinary burden of proof on violators of statutes governing vessels and their navigation and management, "Failure to obey a statute does, indeed, penalize the violator. The penalty, however, is not that the violator is to be held accountable for any mishap, regardless of its relation to the violation. The rule simply is that the violator is penalized with the burden of showing that the violation not only probably did not cause the accident, but that it could not have done so. *This burden it is frequently extremely difficult, if not impossible, for the violator to discharge, in the nature of things; and therein lies the true penalty imposed upon him.*" (Emphasis supplied.) The Princess Sophia, 9 Cir., 61 F.2d 339, 347.

Whether or not the Steamship Company has been able to satisfy this extraordinary burden of proof requires a consideration of the character of the voyage on which it dispatched the Denali. Her voyage from Seattle to Alaska was by the so-called "outside passage". Her departure from Seattle was so timed that she was likely to be and was in fact required to steam from open waters and turn from a general north northwesterly course to a northerly course through Caamano Passage, in the early morning darkness, made the more difficult of navigation, as stated by the Steamship Company and as shown by the log, by a hazy condition of the atmosphere.

The testimony is that so great are the dangers of Caamano Passage that 90 percent of the vessels steaming to Alaska avoid the outside passage route. The southern end of Caamano Passage, which the Denali was approaching, is between Dundas Island on the east and Zayas Island on the west. At the entrance of the Passage the shores of the two islands are about 2⅜ miles apart, but rocks and submerged reefs off each island narrow the passage to 1¾ miles. There are no lights to guide the navigator.

The danger from the sunken reefs is greatly enhanced by powerful tidal currents, at this time running out the Passage

and across the course of the Denali. The pilot-mate states the currents there were very "irregular" and unknown to him and unpredictable because not shown on any "pilot books or Coast Pilot or current books". It is obvious that successive bearings in a cross-current of unknown force and unascertainable exactness of direction, taken by observing the hazy loom of some observable land, would have none of the certainty in determining the ship's course that they have in currentless waters and clear weather. The unknown force and angle of the current makes an incalculable shift in the base line for the four point bearing necessary for exact observation.

As the Denali approached the passage it was planned by the pilot-mate to guide his vessel by an observation of Prince Lebo Island, lying to the easterly of his course and about an hour's steaming time to the south of the Passage. In the haze and darkness this was unobservable. Over an hour before the stranding, Obert, 62 years of age and obliged to wear glasses, abandoned his compass and stood at the open window of his pilot house straining his eyesight in the dark haze to guide his vessel clear of the reefs menacing the mouth of the channel. He said he had the loom only of Zayas Island and he could see "not plain" the 1200 to 1500 feet high peaks of Dundas Island. Thrown into increasing uncertainty by the current, which he miscalculated three times, and thus required him to make three changes of course in his attempts to reach the unseen channel, it is apparent that the Denali's safety was wholly dependent upon the mate's acuteness of observation, concentration and rapidity of judgment and celerity and accuracy of command to his helmsman. That he was unsuccessful and wrecked his vessel on a submerged reef off Zayas Island at the channel entrance is not surprising.

■ This 62 year old substitute for the first mate had navigated the ship for 12 hours in the preceding 24. If he had stood the first mate's statutory time he would have served but 8 hours. The purpose of limiting the mates' watches is to avoid fatigue, and the burden is on the owner to show that the 4 hour excess of effort in violation of the statute *could not* have contributed to the miscalculation in the hour of anxiety and strain which brought the vessel's destruction.

With this difficult burden of proof on the Steamship Company, it offers no testimony at all on the general health and surviving physical vigor of Obert, well past his middle age. More significant, the Steamship Company did not ask Obert, its own witness, nor did he testify, whether or not he felt fatigued from his 12 hours of service as both pilot and mate in the preceding 24 hours—significant because every admiralty lawyer knows the heavy burden on his owner-client where a statutory command is violated in the navigation of its vessel.

Similarly with regard to Obert's assistant, the third mate, also a witness for the Steamship Company. By the Company's orders he was prohibited from navigating the Denali except in the Gulf of Alaska and in open waters. He attempted to verify for his navigating mate the location of the vessel in the changing bearings of the dimly looming islands, as the vessel proceeded in the unknown current and darkness. It is evident that he had miscalculated a bearing he was asked to take on Zayas Island, for, shortly after he reported it, Obert thought they were clear of the reef and entering the channel.

Though the third mate was straining his eyes and mind in his duty of serving Obert, after a violation of the statute by his previous hours of excess work, yet the Company asked him no question and he gave no testimony concerning his physical or mental condition during the period of stress preceding the vessel's destruction.

■ We hold that the Steamship Company has not maintained its burden of proof that the violation of the statute could not have contributed to the disaster, and that the cargo was lost by the Company's fault.

■ (D) With regard to a limitation of liability under the statute granting it, if the loss occurred without the Steamship Company's "privity or knowledge"[3] the burden of proof is on it to establish their absence.

---

[3] Limitation of Liability Act, 46 U.S. C.A. § 183. "§ 183. *Liability of Owner not to Exceed Interest.* The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or

The Silver Palm, 9 Cir., 94 F.2d 776, 777, and cases cited:

In the circumstances of this case, the quantum of that burden is the same as that heretofore discussed. Section 1 of the Act of May 11, 1918, provides that "No vessel [such as the Denali] * * * shall be navigated", et cetera, with her mates regulated as to their watches in violation of Section 2 of the Act, as here found. During the entire voyage, including the navigation leading to the stranding, the navigation of the vessel was in violation of this command of the statute by the act of the Company's management. This violation by the Company itself was participated in by Obert, as an agent, commanded by the petitioner for limitation to violate the statute. Here is both privity and knowledge. It is not conceivable that the Congress intended to give to such wrongdoing shipowners the extraordinary relief of the limitation act, with a less burden of proof relative to the effect of their wrongdoings, than for other violations of statutes for the safety of life and property at sea. Hence the extreme burden of proof of the Pennsylvania and Lie cases, supra, rested on the Company to show that its privity in and knowledge of the violation of the statute could not have contributed to the stranding. As shown it has not made such proof. We hold that the Steamship Company is not entitled to limit its liability to the owners of the cargo under the provisions of the Limitation of Liability statute and that the district court erred in its findings and decision to the contrary.

(E) With regard to the defense of the Harter Act,[4] the burden is on the Steamship Company to establish concerning the Denali that it had exercised "due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied,". May v. Hamburg, etc., 290 U.S. 333, 346, 54 S.Ct. 162, 164, 78 L.Ed. 348. No such diligence has been exercised where there exists on all the Company's Alaska fleet such a customary violation of the three watch mandate for the mates as was permitted to exist on the Denali. The Steamship Company is not entitled to invoke the provisions of the Harter Act against the claims of the cargo owners.

The Steamship Company is liable to the owners of the cargo injured or lost by the stranding of the Denali and the amount of their damage should be ascertained and decreed to them against the Steamship Company.

Reversed.

MATHEWS, Circuit Judge (dissenting in part).

Appellee claimed exemption from liability under § 3 of the Harter Act,[1] 46 U.S.C.A. § 192, and, in the alternative, limitation of liability under § 4283 of the Revised Statutes,[2] 46 U.S.C.A. § 183. Section 3 of the Harter Act provides:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel * * *."

To establish the claimed exemption, it was incumbent on appellee to prove that it exercised due diligence to make the Denali in all respects seaworthy and properly manned, equipped and supplied. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 226, 21 S.Ct. 591, 45 L.Ed. 830; The Southwark, 191 U.S. 1, 12, 24 S.Ct. 1, 48 L.Ed. 65; The Wildcroft, 201 U.S. 378, 386-389, 26 S.Ct. 467, 50 L.Ed. 794; May v. Hamburg-Amerikanische Packetfahrt Aktiengesell-

---

owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. (R.S. § 4283.)"

[4] Harter Act, 46 U.S.C.A. § 192. "§ 192. *Limitation of Liability for Errors of Navigation, Dangers of the Sea and Acts of God.* If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects sea-

worthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel * * *".

[1] Act of February 13, 1893, c. 105, § 3, 27 Stat. 445.

[2] As amended by the Act of June 5, 1936, c. 521, § 1, 49 Stat. 1479.

schaft, 290 U.S. 333, 346, 54 S.Ct. 162, 78 L.Ed. 348.

To be in all respects seaworthy and properly manned, a vessel must be manned in accordance with § 4463 of the Revised Statutes,[3] 46 U.S.C.A. § 222, and § 2 of the Act of May 11, 1918, c. 72, 40 Stat. 549, 46 U.S.C.A. § 223. Section 4463 of the Revised Statutes provides: "No vessel of the United States subject to the * * * inspection laws of the United States shall be navigated unless she shall have in her service and on board such complement of licensed officers and crew including certificated lifeboat men, separately stated, as may in the judgment of the local inspectors who inspect the vessel be necessary for her safe navigation. The local inspectors shall make in the certificate of inspection of the vessel an entry of such complement of officers and crew including certificated lifeboat men, separately stated, which may be changed from time to time by indorsement on such certificate by local inspectors by reason of change of conditions or employment. * * *"

The Denali was subject to the inspection laws of the United States. At all times here pertinent, she had on board and in her service the full complement of licensed officers and crew, including lifeboat men, required by § 4463 and by her certificate of inspection.

Section 2 of the Act of May 11, 1918 provides:

"That the board of local inspectors shall make an entry in the certificate of inspection of every ocean and coastwise seagoing merchant vessel of the United States propelled by machinery, and every ocean-going vessel carrying passengers, the minimum number of licensed deck officers required for her safe navigation according to the following scale:

"That no such vessel shall be navigated unless she shall have on board and in her service one duly licensed master.

"That every such vessel of one thousand gross tons and over, propelled by machinery, shall have in her service and on board three licensed mates, who shall stand in three watches while such vessel is being navigated * * *."

The Denali was an ocean and coastwise seagoing merchant vessel of the United States of one thousand gross tons and over and was propelled by machinery. At all times here pertinent, she had on board and in her service one duly licensed master and three licensed mates, but the mates did not stand in three watches while the vessel was being navigated, as required by § 2. Their failure to comply with § 2 was known to and tacitly, if not expressly, approved by appellee. Therefore, appellee cannot be said to have exercised the due diligence mentioned in § 3 of the Harter Act. Its failure to exercise such diligence defeats the claimed exemption, and this is true notwithstanding such failure may not have caused the loss of cargo. May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, supra, 290 U.S. pages 350-354, 54 S.Ct. 162, 78 L.Ed. 348.

With respect to limitation of liability, § 4283 of the Revised Statutes, 46 U.S.C.A. § 183, provides: "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, [with inapplicable exceptions], exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Appellee, seeking the benefit of this section, had the burden of proving that the loss of the Denali's cargo was incurred without the privity or knowledge of appellee. The Silver Palm, 9 Cir., 94 F.2d 776, 777. This was the ordinary burden of proof, not the extraordinary burden imposed in The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, and Lie v. San Francisco & Portland S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726. The doctrine of those cases—both collision cases—is inapplicable here.

Appellee's burden was sustained. The trial court found "That the sole cause of the stranding of the steamer Denali and the resulting total loss of said steamer Denali and her cargo was due to faults or errors in her navigation of which [appellee] was without privity or knowledge." This finding is amply supported by the evidence and should not be disturbed.

The failure of the Denali's mates to stand in three watches, as required by §

---

[3] As amended by § 1 of the Act of May 11, 1918, c. 72, 40 Stat. 548, 549.

2 of the Act of May 11, 1918, was not a cause of her stranding, but was, at most, a condition thereof. Compare The Perseverance, 2 Cir., 63 F.2d 788, 790.

The decree should be reversed, and the case should be remanded with directions to enter a decree limiting appellee's liability, as provided in § 4283 of the Revised Statutes.