## THE IOWA.

Petition of STATES S. S. CO.

No. A–12653.

District Court, D. Oregon.
Sept. 7, 1940.

844

Erskine Wood and Erskine B. Wood, both of Portland, Or., for petitioner.

James F. Resleure, Carröll Single, and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., Bigham, Englar, Jones & Houston, of New York City, and Veazie & Veazie, Carl C. Donaugh, U. S. Atty., and Cookingham & Hanley, all of Portland, Or., for cargo claimants.

Poe, Falknor, Falknor & Emory and Philip D. Macbride, all of Seattle, Wash., Reynolds, Flegel & Smith, of Portland, Or., McCuthen, Olney, Mannon & Greene, of San Francisco, Cal., and Wilbur, Beckett, Howell & Oppenheimer, Clark & Clark, and B. A. Green, all of Portland, Or., for claimants.

JAMES ALGER FEE, District Judge.

The Steamship "Iowa", on a voyage to San Francisco, left her home port, Portland, Oregon, on January 11, 1936, and after loading at Longview, Washington, on

the Columbia River, cleared there on January 11, 1936. She discharged her river pilot at Astoria, and then started down the river. After she cleared the Columbia bar, and at 3:48 a. m. on the 12th of January, 1936, in a terrific storm, she struck Peacock Spit, a shoal extending out from the Washington shore at the mouth of the Columbia, and was lost with all hands.

The States Steamship Company, owner of the "Iowa", petitioned for (1) exoneration from and (2) limitation of liability. The cargo owners resisted these petitions and the cause was referred to the Honorable Robert F. Maguire, as Commissioner, for trial. Thirty-two volumes, 5,160 pages, of testimony were taken, and the Commissioner filed an able report in which the questions are exhaustively discussed. 1938 A.M.C., 615. Exoneration was denied and limitation of liability was allowed. Exceptions were filed by all parties.

The résumé of the facts found by the Commissioner is borne out by the evidence and the following material excerpts therefrom set the background:

"Except for some 100,000 cu. ft. forward reserved for cargo which she intended to take on in California ports the loading was complete. [At Longview] She had deck loads of lumber both forward and aft thus materially increasing her free-board. She was loaded more heavily in the stern than forward and had a nine-foot drag by the stern. When she left Longview her draft was 17 feet forward and 26 feet aft. She proceeded down the river in charge of a Columbia River pilot who disembarked at Astoria and the vessel proceeded thence toward the mouth of the river under the sole charge of her own officers and proceeded across the bar without taking on a bar pilot. She was fully manned; her Master, Chief Engineer and other officers were competent and experienced in their respective departments. The Master, Captain Yates, had large experience and had commanded several other ships of the same type and model and was familiar with the waters in question, and had taken ships in and out of the Columbia River for years.

"During the winter months the mouth of the Columbia is subject to severe and sudden storms. The prevailing gales are from the southeast to southwest. These gales cause heavy seas at the river entrance and over the bar and a strong northerly set along shore and across the river mouth, which is greatly aggravated at certain stages of the tide.

"The day she left Longview and at the time she passed Astoria, storm signals were flying. By the time she reached the mouth of the Columbia the southeast gale had increased until it was 9 to 11 Beaufort scale.

"The witness Craig, Coast Guardman, who was on lookout at the Cape Disappointment Station January 12, 1936, from midnight to four a. m. * * *, is the only living person who watched the Iowa cross out over the bar and observed her subsequent course. He described the weather as overcast, with rain and hail and the wind increasing from force 10 to at least force 11 with a high surf inshore which indicated that the sea was breaking on the bar. He states that the Iowa passed buoy No. 10 at 1:45 a. m. and that he watched her coming down river and she was then going slowly, but after she reached buoy No. 10 picked up speed and seemed to be all right. That there was nothing unusual about the ship's course or condition. Buoy No. 10 is about one mile from the lookout station. After passing it the Iowa ran out to buoy No. 6, whose light Craig could see. At buoy No. 6 she seemed to hesitate after laying her course for the light, but he could not tell whether she actually did so or seemed to do so because she was running directly away from him. The ship was on its regular course That as near as he could see, the ship was headed south and its subsequent movements indicated that the northerly current was setting her northward. The vessel appeared to be bucking the wind and the current. That as he observed her the visibility would rise and lower, but he saw the ship all the way out to buoy 6, but from then on his view would be interrupted by rain squalls and at about 2:45 a. m. he noticed that she was drifting slowly to the northward; that no flares, rockets or other distress signals were given. The last time he saw the Iowa was just before 3:30 a. m. when he went out to punch the clock at the edge of the cliff. At that time, as he describes it, 'a Hell of a squall came by' and the visibility lowered so that he could no longer see the ship. It was then bearing 240 degrees from the lookout, and the wind by that time had shifted to the southwest; that when the Iowa reached buoy 6 the witness could see the lights of the Columbia River light ship which lies several miles

further out. That the lookout station is about five hundred feet from the front red range light of the main channel range; that when the witness last saw the Iowa he thought it was far enough out to clear the sands of Peacock Spit. * * *

"The next morning Craig, as a member of the Coast Guard crew, went out in a surf boat and arrived at the Iowa as she lay on the Spit and noted that her anchors were both in their hawse pipes. As the Iowa passed, her starboard running light and both mast lights were visible together with other lights of the ship which he was unable to identify. When she made the turn at buoy 6 he could see her wake light. The last time he saw her starboard running light was when the ship was upstream from him. She never appeared to him as though she needed assistance and he thought she would make it all right.

"While it was impossible for Craig to determine the precise heading of the vessel after she turned at buoy 6, it seems clear that she never was again broadside to him, as he never again saw the starboard running light or any other lights such as those from port holes or cabin windows or on the deck. Had the ship's engines failed or her rudder jammed, the force of the wind would undoubtedly have thrown her head around, revealing her other lights.

"The Commissioner is of the opinion and so finds that the Iowa came out of the Columbia River, headed toward the south on her regular course and proceeded across the bar towards the open sea; that the set of the current, and the force of the gale gradually set her over to the north until she struck the outer ends of the Spit. At about 3:12 a. m. she made her usual radio report of position, namely, that she crossed out the Columbia River at 1:00 a. m. bound for San Francisco with further message 'I have nothing for you.' She sent up no flares or rockets, sent no distress signals by radio or otherwise until she actually struck. Her first distress signal was by radio 'S.O.S.' and was received at 3:48 a. m. followed by the message, 'We ashore off Pea—' * * *. It would seem obvious that no untoward event had occurred up to 3:12 a. m. when the report of position was given. Had there been a failure of steering gear or engine it is inconceivable that an experienced. Master, familiar with the conditions then existing at the bar, would not have immediately sent out distress signals, or at least dropped his anchors and attempted to ride out the gale. The Master had had years of experience in entering and leaving the Columbia River, and his knowledge of the strong northerly current caused or aggravated by southeasterly to southwesterly gales would have made it obvious the ship was in danger the moment her engine or steering apparatus failed.

"The inescapable conclusion which must be reached is that the Master of the Iowa labored under the belief that he had fought clear of the bar and that his ship had made sufficient offing to clear the Spit. No sane man would have hazarded the lives of the crew and himself by permitting the ship to drift into disaster without giving some notice to the shore and to other ships that he was helpless and was about to strike Peacock Spit."

The Iowa is charged with unseaworthiness in several particulars at the time of departure from Portland, her home port. The Commissioner found that if the vessel had a list at Longview it was inconsequential. There was a high freeboard and a drag in the stern there also. Neither of these variances was held to constitute unseaworthiness. The ship at times had had failures in the Benson telemotor steering gear, but had traveled many thousand miles thereafter and prior to her final voyage, at which time it was held the gear was in good order and condition and the ship seaworthy in that respect. Complaint was made of the engine and engine room equipment. But this was all inspected, passed and approved by the Bureau of Marine Inspection and Navigation, and engineers who had operated the engines testified everything was in good and efficient working order. There was an important conflict in the testimony as to the condition of the compasses but weight should be given to the testimony of the witness Taucher who had been master of the Iowa until a few days before her final voyage and who is no longer in the service of the company. He testified that the compasses were in good condition and explained variations due to steel cargo.

The Commissioner found the ship seaworthy in all these respects. Appropriate weight should be given to his findings based on conflicting evidence. Since the Iowa was lost with all aboard, meticulous care has been shown to cumulate defects, but the impression that these are makeweights remains. In any event, the

evidence strongly confirms the findings in these regards and the voyages of the vessel on the seven seas add the assurance that she was reasonably fit for those ventures and since the conditions were not materially changed that she was seaworthy in these respects for her final journey.

There are, however, the contentions of unseaworthiness which the Commissioner held well founded, first, to the failure to have aboard the charts of the Columbia Bar showing conditions of the aids to navigation, and second, the lack of communication system to her emergency steering gear, in violation of an order of the Board of Supervising Inspectors which had gone into effect eleven days earlier.

█ There is no question that the company changed its system of supplying the local notices to mariners, and that Captain Yates did not receive the local notice from the accustomed source. This ship would have been unseaworthy if up-to-date navigating information were not aboard when the voyage commenced.[1] There is no proof at all that the ship did not have the local notice when she broke ground at Longview. This conclusion rests entirely upon assumption.

█ The "Iowa" was in the hands of a competent Master and it was his duty to know all the local conditions before he left Astoria. It must be assumed that he knew the state of the local aids to navigation and the storm conditions prevailing when he put to sea. But the petitioner for exoneration must not only show that competent persons were employed and charged with the duty but that all due diligence was exercised to render the ship seaworthy.[2] This duty was non-delegable[3] and included the furnishing of the local notices as to aids to navigation on the Columbia Bar.[4] The petitioner cannot rely upon presumption of performance of duty,[5] but must establish "due diligence" or "seaworthiness".[6] But petitioner did not use any care to have information as to local conditions in the hands of the Master at either Portland or Longview. The Commissioner found the ship unseaworthy in this respect, and the finding is affirmed.

The more serious defect, the lack of a communicating system with the emergency steering gear, remains for consideration. An elaborate argument is made that no communication system installed would have been approved, that it was not reasonable and practicable to install such system and finally that the inspectors approved the vessel and permitted her to sail without this equipment, but the Commissioner's findings are to the contrary upon these questions of fact.

█ The proposition that a system could not be installed until the type had been approved is so far-fetched that it meets no consideration. It is clear that when demand has advanced so far that the Board requires such a system, a ship is unseaworthy which does not possess the equipment, even in the absence of an order. The vessel was not reasonably equipped for the contemplated voyage under such circumstances in accordance with the established rule.[7]

There is here no presumption of seaworthiness.[8]

█ The Commissioner was, therefore, correct in denying exoneration to the petitioner under the Harter Act, 46 U.S.C.A. §§ 190–195, as no causal connection between unseaworthiness and loss need be shown to prevent exoneration.[9]

The petition for limitation of liability presents a different situation. Under the statute, such a petition must be allowed if the loss was "occasioned, or incurred"

---

[1] The Maria, 4 Cir., 91 F.2d 819, 824.

[2] The Maria, supra, 91 F.2d 823.

[3] See The Southwark (Martin v. Southwark), 191 U.S. 1, 14, 24 S.Ct. 1, 48 L.Ed. 65; May v. Hamburg, etc., Gesellschaft, 290 U.S. 333, 350, 54 S.Ct. 162, 78 L.Ed. 348.

[4] See The W. W. Bruce, 2 Cir., 94 F. 2d 834, 836, 837.

[5] See The Viking, 6 Cir., 271 F. 801, 805.

[6] The Wildcroft (W. J. McCahan Sugar Refining Co. v. Wildcroft), 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794; The

Southwark (Martin v. Southwark), supra, 191 U.S. 12, 24 S.Ct. 1, 48 L.Ed. 65.

[7] Atlantic Transport Co. of West Virginia v. Rosenberg Bros. & Co., 9 Cir., 34 F.2d 843, 846; The T. J. Hooper, 2 Cir., 60 F.2d 737, 740.

[8] The Wildcroft (W. J. McCahan Sugar Refining Co. v. Wildcroft), supra, 201 U.S. 388, 26 S.Ct. 467, 50 L.Ed. 794.

[9] May v. Hamburg, etc., Gesellschaft, supra.

without the privity or knowledge of the owner.[10]

No one knows exactly what happened to the "Iowa" after passage out to open sea was begun. A competent Master was in complete control and the responsibility was his. Under normal weather conditions the ship could have navigated the bar. In the terrific storm, this ship, so powered and so loaded, should not have been committed to the cramped quarters of the channel. The owners in Portland would have no right to dictate action under these circumstances, nor could privity or knowledge of the Master's error be established or imputed.[11] The gallant shipmaster who took the chance, relying on his skill despite the storm, compels admiration. He misjudged and failed. He expiated fault by going down with his ship according to the tradition of the sea. In the light of all the circumstances, his recklessness was the sole cause of the disaster. The testimony of the single eyewitness to the behavior of the ship confirms the conclusion.

The Commissioner found that the Master was guilty of negligence "which was the proximate cause of the loss of the Iowa" in taking the ship out to sea under all the conditions, and that petitioner was not connected by privity or knowledge with the act or the loss. These findings are supported by competent evidence and are adopted.

Such findings would entitle the petitioner to limitation were it not for the fact that the "Iowa" was unseaworthy in respect to the absence of communication to the emergency steering gear. The Denali, 9 Cir., 105 F.2d 413,[12] in a limitation proceeding casts the burden of proving that this violation of the order of the Board of Supervising Inspectors, if statutory in character, not only did not cause or contribute to the stranding but could not have done so. This decision establishes the law in the instant case. Petitioner had privity to and knowledge of this violation.

There was an argument presented to this court but not to the Commissioner to the effect that the matter of communication system for the emergency steering gear was not committed to the Board of Supervising Inspectors by law.[13] It is doubtful, therefore, whether a violation of the regulation amounted technically to a breach of a statutory duty, under the rule of The Pennsylvania.[14] Textually considered, the statutes do not seem to have directly conferred the power. Approved types of communication systems were designated after the wreck of the "Iowa", and some hesitation and doubt as to the interpretation of the order existed apparently among the local inspectors and the Board itself. The historical background of the acts, the purpose thereof to promote security of life and property at sea, and the administrative conclusion that the regulation was necessary justified an exact compliance.[15] But it is to be observed that a regulation should be positive and its applicability unquestioned before the drastic rule of The Pennsylvania [14] should be applied. It will be assumed that the regulation had the force of a statute, but the court does not rule upon that question.

A distinction is to be noted between this case and The Denali, supra.[12] There the violation of the rule as to watches was shown to be an operating factor at the moment the ship struck. The question of amount of contribution to disaster was held immaterial. Here, on the other hand, the emergency gear was not even in operation so far as known and the proximate cause of disaster cannot be linked to it. In a collision case, any violation of the rules of navigation is an operative element, and the amount of contribution, if any, to loss is the salient question. The requirement that the violator there negative any causation is clearer than in a

---

10 Title 46 U.S.C.A. §§ 183–185.

11 "An owner who has appointed a competent shipmaster is entitled to rely on his judgment in the navigation of the ship." The G. K. Wentworth, 9 Cir., 67 F.2d 965, 966; The Styria (The Styria v. Morgan), 186 U.S. 1, 9, 22 S.Ct. 731, 46 L.Ed. 1027; Butler v. Boston & Savannah Steamship Company, 130 U.S. 527, 9 S.Ct. 612, 32 L. Ed. 1017; The Oritani, D.C., 40 F.2d 522, 528.

12 Pacific Coast Coal Company v. Alaska Steamship Co., 9 Cir., 105 F.2d 413.

13 R.S. § 4405, 46 U.S.C.A. § 375, referring to 46 U.S.C.A., Chapters 14, 15.

14 The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148.

15 The breadth of application is illustrated by Compagnie de Navigation Francaise v. Burley, D.C., 183 F. 166, 167.

stranding case where the violation probably was not even operative at time of loss and certainly did not contribute to the proximate cause.

Here, no possible relation between the absence of the communication system required by rule could be deduced. Inference must be imposed upon inference to decide that, first, the main steering gear broke, second, the emergency steering gear was coupled in the storm, and third, that any communication system would have been of avail to prevent disaster. By reduction to surd, if any ship goes down at sea with all hands and without observers, violation of any minor administrative regulation would render the shipowner liable. Unless the rule established by The Denali,[12] supra, goes to this extent, limtation must be allowed.

The suggestion that there is a possibility that the lack of the communication system to an emergency steering gear could have contributed to the disaster is wildest speculation. Perfectly seaworthy gear of the ship failed to withstand the tempest. The sole cause of failure was the decision of the Master to commit the vessel to the wind and wave. No other circumstance was of causal consequence.

 Although, as has been held above, unseaworthiness which has no causal connection with loss is ground for denial of exoneration under the Harter Act, the statute here considered does not deny limitation of liability where unseaworthiness in some respect not connected with the loss exists.[16] Even if seaworthiness is not established, the claimant has the burden of proving "a causal connection between unseaworthiness and the foundering".[17] Since the loss must have been "occasioned, or incurred" by some operating factor, inquiry as to the cause must be made in order to make a reconciliation of this doctrine and that of The Denali, supra.[12] The proximate cause of disaster here was the negligence of the Master in putting out to sea under all the circumstances.[18] The lack of a communication system to the emergency steering gear might have acted as a deterrent and so prevented this error in navigation by the Master. It could not have contributed to this proximate cause of loss, so found.

The petitioner bore the burden imposed by The Denali,[12] supra. It was proved that the Iowa's "loss was not occasioned by any lack of seaworthiness" and that "there was in fact no causal connection between the failure to install such a communication system and the loss of the ship". The evidence upon which this finding is based indicates that the ship had been operated from Portland to Astoria by her main steering gear. The presumption in the absence of evidence is that the main steering gear was still in use at the moment of the strand. The behavior of the ship immediately prior to stranding and her radio messages indicate that no steering gear, however efficient, would have saved her.

In The Princess Sophia, 9 Cir., 61 F. 2d 339, 347,[19] the cause of the loss of life was found to be the decision of the Master not to attempt transfer of the passengers and crew to other vessels. The petitioner had violated the statute in three particulars, (1) there were some boys on the ship taking the place of able-bodied seamen, (2) the crew was insufficient, (3) deficiency of lifeboats. The opinion in that cause applied the Pennsylvania (note 14) rule. There was no direct evidence that these violations did not contribute to the disaster, since all aboard were lost. However, the court say: "Failure to obey a statute does, indeed, penalize the violator. The penalty, however, is not that the violator is to be held accountable for *any* mishap, regardless of its relation to the violation". This expression was carried into decision by application to specific situations. It was said: "Be that as it may, we do not believe that the presence of these boys on board the Sophia in any

---

[12] Pacific Coast Coal Company v. Alaska Steamship Co., 9 Cir., 105 F.2d 413.

[16] The El Sol, D.C., 45 F.2d 852, 855; The Eastland, 7 Cir., 78 F.2d 984, 987, 988; The Yungay, D.C., 58 F.2d 352, 357.

[17] In re Eastern Transportation Co., D.C., 37 F.2d 355, 358; The Carroll, D.C.Md., 60 F.2d 985, 990.

[18] See White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Company, 258 U.S. 341, 344, 42 S. Ct. 338, 66 L.Ed. 649.

[19] This case is often interpreted as one in which no statutory violation was found, but the language of the court indicates the contrary, and the decision is interpreted in The Denali (note 12), as establishing the application of the Pennsylvania (note 14) rule to stranding cases in this Circuit.

way contributed to the disaster." Again: "Insufficiency of the crew was not a cause of the disaster. Nor can insufficiency or deficiency of lifeboats be causally linked with the foundering."

 The finding of the Commissioner who heard the testimony and saw the witnesses is of great weight.[20] It is accepted as a finding that the lack of the communication system could not have caused or contributed to the foundering. Independently, the court on the evidence holds that the lack of a communication system is not shown to have been an operating factor at the time of the disaster and that the application of the stricter rule to the situation would be an injustice.

The shipowner is entitled to have the law administered so as to give "the full benefit of the immunities intended to be secured" by the limitation acts in order to encourage commercial operations.[21]

The opinion of the Circuit Court of Appeals of the Ninth Circuit in the case of The Denali, supra, was of so much importance in the determination here, that decision has been reserved until the petition for rehearing was there denied.[22] In the opinion on rehearing the distinction between a situation where it was decided upon the facts that there was no causal connection between statutory fault and disaster, and the situation where some possible relation was shown, is observed.

It was there said:

"The Denali cites the Second Circuit case of The North Star, 255 F. 955, 956. That case affirmatively held that the violation of the statute 'had nothing whatever to do with the collision.' It does not discuss the Pennsylvania rule. Also cited is the New York district court opinion in The Suduffco, 33 F.2d 775, 776, which holds no more than that 'The facts established exclude the possibility of petitioners' privity or knowledge of the manner in which the vessel was navigated or the circumstances under which she was lost.'

"The Denali also cites the dictum of District Judge Woolsey in El Sol, D.C.,

45 F.2d 852, 855, made after he had held affirmatively that the owner's violation had not contributed to the collision: 'To preclude limitation on the ground of privity or knowledge it is not, in my opinion, sufficient merely to prove that there was a failure in equipment inspection or personnel to. which the shipowner was privy or of which he had knowledge. It must be shown that the fault in equipment, inspection, or personnel actually contributed to the accident in respect of which the shipowner seeks limitation.' On appeal, the Second Circuit Court of Appeals refused to accept the dictum and held that, assuming the Pennsylvania rule to apply, it affirmatively appeared that the owner's violation had not contributed to the loss. Southern Pacific Co. v. United States, 72 F.2d 212, 215."

It is concluded that the court does not repudiate the rule as applied in The Princess Sophia,[19] supra, and that, therefore, the findings of the Commissioner are not contrary to law.

The exceptions are denied and the findings and report of the Commissioner are adopted.

---

[19] This case is often interpreted as one in which no statutory violation was found, but the language of the court indicates the contrary, and the decision is interpreted in The Denali (note 12), as establishing the application of the Pennsylvania (note 14) rule to stranding cases in this Circuit.

[20] Admiralty Rule 43½, 28 U.S.C.A. following section 723.

[21] Providence & New York Steamship Company v. Hill Manufacturing Company, 109 U.S. 578, 588, 589, 3 S.Ct. 379, 386, 617, 27 L.Ed. 1038. See The Princess Sophia, supra.

[22] The Denali (Pacific Coast Coal Co. et al. v. Alaska Steamship Company), 9 Cir., 112 F.2d 952, 958.